# EXHIBIT G

Case 3:08-cv-50031     Document 12-8     Filed 03/20/2008     Page 1 of 14

Westlaw.

Not Reported in F.Supp.2d                                                          Page 1
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**C**Tabacchi v. Harrison
N.D.Ill.,2000.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
Gian Andrea **TABACCHI**, Plaintiff,
v.
Deirdre **HARRISON**, Defendant.
**No. 99 C 4130.**

Feb. 10, 2000.

MEMORANDUM OPINION AND ORDER

GOTTSCHALL, District J.
*1 On June 22, 1999, Gian Andrea Tabacchi
("Petitioner") brought this action pursuant to the
Hague Convention on the Civil Aspects of
International Child Abduction and the International
Child Abduction Remedies Act ("ICARA"), 42
U.S.C. 11601*et seq.* Tabacchi seeks the return of his
minor child, Beatrice Mairead Tabacchi ("Beatrice"),
to Italy. Respondent, Deirdre Harrison, who is
Beatrice's mother, opposes Tabacchi's petition and
seeks to retain Beatrice in the United States. After
several delays occasioned by the parties' settlement
discussions, a bench trial was held on November 24,
29, and December 3, 1999. The court now issues its
findings of facts and conclusions of law.

I. *FINDINGS OF FACT*[FN1]

> FN1. The parties submitted several
> affidavits in support of their positions. The
> court gave due consideration only to those
> affidavits it deemed relevant in determining
> its findings of fact.

Gian Andrea Tabacchi and Deirdre Harrison met in
New York City in September 1994. At the time,
Harrison was pursuing her career as an actress.
Tabacchi was working as a composer and running a
nonprofit orchestra. The two began a relationship and
eventually began living together in Tabacchi's
apartment in Manhattan in January 1995. A few
months later, the couple decided to move to
Tabacchi's family farm in the Italian countryside for

at least a few years.

On July 14, 1995, Tabacchi and Harrison arrived in
Rome, Italy. A few days after their arrival, the couple
moved to Tabacchi's father's farm in Palombara
Sabina, Italy, which is about fifteen miles from
Rome. The ten acre estate was run as a commercial
farm. There was a farmhouse and a cottage on the
property. Tabacchi and Harrison moved into the
farmhouse. With the help of Tabacchi's father,
Harrison obtained a fiscal code number (the
equivalent of a social security number in the United
States) and a bank account. She took a job teaching
English and continued to take acting jobs.

In July 1996, Harrison learned that she was pregnant.
In October 1996, Harrison and Tabacchi decided to
get married. They were married in Rome on
November 18, 1996. Their daughter Beatrice was
born at the Tabacchi family home in Palombara
Sabina on March 14, 1997.

Harrison and Tabacchi had a tumultuous marriage
that at times involved violent arguments. During their
arguments both would frequently yell, swear, and
occasionally throw things. On one occasion,
Tabacchi threw a food processor to the kitchen floor
and smashed it. In another of their heated arguments,
Tabacchi threw a coffee cup filled with coffee to the
kitchen floor just as Harrison's mother, Jennifer
Shaw, was stepping into the room. Tabacchi once
pushed over Harrison's bookcase in her office and
threw her work to the floor. On another occasion,
Tabacchi threw a wine glass on to the bocce ball
court, smashing the glass. Tabacchi once threw a
remote control towards Harrison, breaking the glass
on a painting on the wall about five feet from
Harrison. Harrison also threw things occasionally. In
one argument, she threw a phone book and other
office supplies at Tabacchi and to the floor. No one
was injured in any of these incidents. The only
incident Beatrice witnessed was the one involving the
smashed wine glass.

*2 The first incident of physical abuse in the parties'
relationship occurred in January 1997, in the
bedroom of their home, when the couple engaged in a
heated argument that resulted in Tabacchi grabbing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

Harrison's arm. Harrison had gone into the hallway to call a friend. They argued over whether it was too late in the evening for such a call and struggled over the phone. Harrison began throwing items from the phone stand. Tabacchi slapped her across the cheek with his open hand. After a few minutes, Tabacchi approached Harrison again. At that point, Harrison threw the phone at him, hitting him in the head. Tabacchi then slapped her again on the cheek. Harrison grabbed her handbag and keys. Before she could leave the house, Tabacchi grabbed her bag. He then locked her out of the house. Harrison managed to get back into the house after a few minutes. She retrieved her keys and took the car for a drive. She returned home after a few hours. The couple talked about the fight and apologized and reconciled. Harrison did not go to the police about this incident or seek medical attention.

The second incident occurred in September 1997, when Harrison, Tabacchi, and Beatrice were out driving. Harrison was driving and Tabacchi was sitting in the back seat. Harrison missed a turn. The couple began arguing again; both were yelling and swearing at each other. Tabacchi put his hands on Harrison's neck. Harrison testified that Tabacchi was trying to choke her. Tabacchi testified that he had merely put his hands on Harrison's shoulders to try to calm her. Harrison pulled the car over and ordered him out of the car. Tabacchi got out after a few minutes. Harrison then asked Tabacchi to get back into the car, but he refused. Harrison drove away with Beatrice.

Later that day or a few days later at their home, the couple got into an argument about their altercation in the car. As Harrison walked out of the room, Tabacchi hit her with his fist on the back of her head, just above the nape of her neck. Harrison fell to the floor. She got back on her feet and went to get Beatrice who was in a room across the hall. She took Beatrice and went to the cottage behind the house. She locked herself in and called her mother.

In February 1998, the couple had yet another explosive argument at their home in Palombara Sabina. Tabacchi testified that Harrison became angry with him, shouting that he cared more about his musical instruments than he cared about her. Harrison threatened to throw Tabacchi's instruments out the window, went into the bedroom and began

throwing things outside. Tabacchi followed her into the room and grabbed at her waist. Harrison's shirt ripped and she fell backward, landing on her buttocks. Tabacchi got back up, took off her shirt, and threw it out the window to show others, she testified, how Tabacchi was treating her.

In November 1998, an argument again escalated to violence. Harrison and Tabacchi were arguing in the living room of their home. Tabacchi stood up, put two hands on Harrison's chest, and pushed her down. Tabacchi then clenched his fists together and hit Harrison on the top of her head. Harrison called Tabacchi's father, Giunio, who lived in the cottage on the property. She told him that she wanted Tabacchi out of the house. Giunio attempted to mediate and they agreed that Tabacchi would stay in the cottage. However, Tabacchi continued to stay in the house.

*3 In December 1998, Harrison's mother, Jennifer Shaw, came to stay at the home in Palombara Sabina. On January 13, 1999, Tabacchi engaged in an argument with Shaw, in which he told her that she should be locked up or tied up. Shaw retreated to her bedroom. Harrison called Tabacchi's father, Giunio, and left him a message telling him to get Tabacchi out of the house immediately. Harrison told Tabacchi that if he did not go elsewhere she would take Beatrice away for good. Tabacchi spent that evening and the next in the cottage.

On the morning of January 15, 1999, Harrison packed some clothing and documents to take to the home of her neighbor, Josephine Campbell, where she was going to stay with Beatrice and Shaw. When Harrison was packing the items into the car, Tabacchi came from the cottage to the house to get a screwdriver. He saw Harrison and grabbed the keys from the car. He questioned her about where she was going. The two began arguing. Harrison's mother came outside and took Beatrice from Harrison. Campbell and another neighbor, Ugo Laurenti, arrived. They both talked to Tabacchi. Finally, Tabacchi consented to allow Harrison and Beatrice to go to Campbell's house, which they did.

Later that day, Ugo relayed a message from Tabacchi to Harrison that Harrison could pick up her belongings from the house while he was out. Ugo told Harrison that Tabacchi agreed that Harrison could take Beatrice to the United States for three

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

months if she signed something. Harrison then drove to the house with Ugo. Tabacchi came into the house and asked Harrison what her intentions were. She told him that she was going to the United States to stay with her family. Tabacchi said he was going to the police and Harrison said she would too.

Tabacchi drove to Campbell's house to get Beatrice. Tabacchi went inside Campbell's house where Campbell and Shaw were watching Beatrice and Campbell's foster children play. Tabacchi entered the house, yelling for Beatrice. He grabbed her from the floor and hurriedly walked toward the door. Shaw jumped in front of him and attempted to block the door with her body. Tabacchi, who was holding Beatrice, attempted to push Shaw out of the way. He changed course and went to the back door. He walked around to the front of the house where he again confronted Shaw. He walked past her and proceeded toward the front gate where his car was parked. At that moment, Harrison drove up with Ugo. Harrison jumped from the car and ran toward Tabacchi with her arms outstretched to block him. Tabacchi flailed his free arm (one arm was holding Beatrice) to push Shaw out of the way. Tabacchi's arm hit Harrison with considerable force, hitting her in the eye and the mouth and knocking her to the ground. Harrison suffered a black eye and loosened teeth.

Harrison got off the ground and succeeded in blocking the driveway with her car to keep Tabacchi from leaving with Beatrice. Tabacchi got into Ugo's car with Beatrice. Ugo convinced him to get out. Tabacchi gave Beatrice back to Harrison. Harrison, Campbell and Shaw went into the house to call the police. Tempers cooled and the police came, approximately forty-five minutes later. When the police arrived, Tabacchi asked if he could charge Harrison with child abduction. The police told him that he could not do so because Harrison was the child's mother and because Tabacchi and Harrison were still married. The police asked Harrison if she wanted to report the assault. She did. Harrison drove to the police station with Campbell, Beatrice, and Shaw. Later that evening, when Harrison, Campbell, Shaw and Beatrice left the police station, they saw Tabacchi walking toward the station with his father, Giunio.

*4 Harrison dropped off Campbell and drove to

Rome to stay with a friend. While she was in Rome, she made arrangements to leave Italy the next day. She had no communication with Tabacchi that night. Tabacchi tried to reach Harrison that evening via her cellular phone, but he was unsuccessful.

At 7:25 p.m. on the January 15, 1999, Tabacchi filed an oral report with the Palombara Police regarding the events of that day, which the police transcribed. He recounted the incidents at the farmhouse and at Campbell's house and reported that Harrison said, "I WILL TAKE ALL YOU HAVE, ASSHOLE, YOU WILL NEVER SEE THE CHILD AGAIN."Pet. Ex. 6B. Tabacchi proposed a "formal report-complaint against HARRISON Deirdre for all the offences [sic] that the Judiciary Authority will want to recognize in the facts described, asking the punishment of the offender."

The next day, Tabacchi went to the family court in Rome to see what he could do to keep Harrison from leaving with the child. He followed the judge's suggestion and went to the police station to have Beatrice's name put in the "passport book" to prohibit her removal from the country. On his way home, he stopped at another police station to file a report and to see if there was any way of tracking Harrison's location. The police told him that they had no way of tracking Harrison at that time. At about 12 or 1 p.m., he called their neighbor, Josephine Campbell, to see if she knew Harrison's whereabouts. Campbell said she did not. He called Campbell again around 3:30 p.m. and Campbell told him that Harrison and Beatrice were "probably on a plane."

On the morning of January 16, 1999, Harrison flew to London with Beatrice. She did not tell Tabacchi that she was leaving. She sent him a postcard from the airport in Italy, stating, "It is not my intention to withold [sic] total rights or access to your daughter as I leave the country. Trust me if you can. I pray you do. Bea is fine. Deirdre." Harrison and Beatrice stayed the night in London and left the next day for Chicago, arriving on January 17, 1999.

Harrison's mother, Shaw, did not leave Italy with Harrison and Beatrice but stayed in Italy at Campbell's house for a few more days. Tabacchi did not harass her or attempt to contact her while she was staying there.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

Since Harrison and Beatrice left Italy, they have been living with Harrison's brother in Chicago. Harrison is unemployed and receives support from her father and occasionally from her brother.

On January 18, 1999, Tabacchi called Harrison at her brother's apartment. Harrison told him that she and Beatrice were safe.

Harrison told Tabacchi about her plan to divorce on January 19. On January 21, 1999, Harrison filed for divorce and for an order of protection in the Circuit Court of Cook County.

Tabacchi filed a petition for separation in the Civil Court of Rome on February 11, 1999, in which he sought custody of Beatrice. Pet. Ex. 1B. Harrison and Tabacchi were each represented by Italian lawyers at the proceedings before the Civil Court, although Harrison did not personally appear. On July 27, 1999, the petition was granted. The court's order provided for separation of the spouses and granted Harrison temporary custody of Beatrice pending an "in depth technical evaluation of the parental fitness of both parties ...." Pet. Ex. 2B. The court granted Harrison temporary custody with the obligation that she bring Beatrice back to Italy to allow the child adequate visitation time (45 days) with Tabacchi in the environment where she had grown up since birth. This order was made "temporarily, without prejudice to the necessity and the urgency of an in depth technical evaluation of the parental fitness of both parties and the effect of the sudden change of residence of the mother on the psychological and physical development of the minor ...." Tabacchi was ordered to pay Harrison child support. The court ordered a psychiatric evaluation of Beatrice to determine the best long term custody arrangement. *Id.* To date, only one meeting with the court-appointed psychiatrist has occurred and only Tabacchi, Harrison's lawyer, and the psychiatrist were present.

*5 On March 6, 1999, Tabacchi prepared a document addressed to the "Attorney of the Republic c/o the District Magistrateis [*sic* ] Court of Rome" to complain about Harrison's conduct. Resp. Ex. 60. He set out his version of the facts leading up to Harrison's removal of the child from Italy and stated that in order to justify her removal of Beatrice, Harrison "has covered me with false and slanderous accusations, claiming that I mistreated her."He accused her of going to the United States to prevent him from having contact with Beatrice and to "extort" financial support from him. The status of this document under Italian law has not been explained to the court.

Tabacchi filed his petition under the Hague Convention in this court on June 22, 1999.

Since Harrison removed Beatrice from Italy, Tabacchi has maintained contact with Beatrice. Tabacchi has spoken with Beatrice over the phone and has sent her letters. He has sent Beatrice and Harrison gifts and flowers. In February 1999, Tabacchi sent Harrison a check for $580 at her request. No other financial support has been provided since then, despite the Italian court order.

Aside from a few short trips to London with her mother and vacations, Beatrice was never outside of Italy before January 16, 1999. She was born in Palombara Sabina, and lived at the farmhouse. She often played with the neighbor's children. Tabacchi and Harrison were both involved in Beatrice's care and made the majority of the decisions regarding her care together. Tabacchi fed Beatrice, bathed her, medicated her, changed her diapers, played music for her, shopped for her, and cooked for her, among other things. Tabacchi's father obtained a fiscal code number to allow Beatrice to enroll in Italy's National Health Service. Harrison and Tabacchi enrolled Beatrice in a Montessori school in Palombara Sabina and paid for her tuition. She started school in January 1999.

Tabacchi never abused Beatrice. However, Harrison has expressed concern about Tabacchi's parental fitness based on two incidents. First, in 1997, Tabacchi became frustrated with Beatrice because she would not stop crying. Tabacchi began shaking her, albeit not hard. Harrison told him to stop, which he did, although he also told Harrison to "shut up." Second, after the altercation on January 15, 1999, Harrison discovered a bump on Beatrice's head. Tabacchi had been holding Beatrice. Harrison has no knowledge of how Beatrice got the bump on her head but expressed concern that Tabacchi could have had some responsibility for it.

Since Harrison and Beatrice left Italy, Tabacchi has

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

visited with Beatrice in Chicago. Harrison facilitated a number of visits. On two occasions in October and November 1999, Harrison took Beatrice to Tabacchi at his hotel so that Beatrice could stay overnight with him. On another occasion she invited Tabacchi over to make dinner.

As stated above, Tabacchi has lodged with Italian authorities a number of complaints against Harrison in connection with her removal of Beatrice. There has been no proof of Italian law in this case, and this court is without any knowledge of what the legal effect of these complaints is under Italian law or whether they could lead to the arrest and/or confinement of Harrison were she to return to Italy, something Harrison has argued could occur, but without introducing any supporting evidence.

*6 Tabacchi testified that he instructed his Italian attorney to withdraw all of his complaints against Harrison on November 23, 1999, and his lawyer has informed him that they have been withdrawn. Because there has been no proof of Italian law in this case, the court does not know the effect of Tabacchi's voluntary withdrawal of these complaints.

Tabacchi has agreed, if Harrison and Beatrice return to Italy pending custody proceedings there, to provide housing and a car. He testified that he would also pay the support ordered by the Italian court. He agreed to refrain from challenging the temporary custody order and promised not to seek any criminal or civil sanctions against Harrison.

II. *EXPERT EVIDENCE*

Dr. Alan Ravitz, a child psychiatrist, testified on behalf of Harrison regarding the level of attachment between Harrison and Beatrice. Dr. Ravitz evaluated the potential impact of separating Beatrice from Harrison. He interviewed Harrison three times. He met with Beatrice and Harrison together for one hour to observe their interaction. Based on what Harrison told him and on the relationship he observed between Harrison and Beatrice, Dr. Ravitz concluded that Harrison was Beatrice's primary caretaker.[FN2]Dr. Ravitz testified that Beatrice was healthy and precocious. He testified that Harrison suffered no psychosis, based on his four meetings with her, but he was not asked to focus on Harrison's health but only on the risks separation poses for Beatrice.

FN2. It should be noted that it is undisputed that since Harrison removed Beatrice to Chicago, Tabacchi has had very limited contact with her.

Dr. Ravitz testified that the degree of attachment between Harrison and Beatrice was secure. He testified that if the two were separated, it would be traumatic, but that a child may recover from such trauma if placed in a caring environment. The risks would be greater if Harrison was imprisoned or if Beatrice's new caretaker was hostile to Harrison. He testified that in some cases of separation, children suffer from separation anxiety disorder. He could not predict whether Beatrice would suffer from such a disorder if separated from her mother. He gave the opinion that if Beatrice and Harrison were separated for more than three to four weeks, Beatrice would likely suffer grave emotional harm.

Although Harrison told Dr. Ravitz about her history with Tabacchi and their family life, Dr. Ravitz did not conduct any independent evaluation of Tabacchi or of his relationship with Beatrice. He could not opine on the level of attachment between Tabacchi and Beatrice. He testified that if Tabacchi was an excellent caretaker, the risk of harm to Beatrice in case of separation from her mother would be lessened. He testified that if Harrison returned to Italy with Beatrice and lived in a separate residence from Tabacchi, there could still be emotional harm to Beatrice if the move negatively affected Harrison's psychological well-being. Dr. Ravitz did not observe any mental or emotional problems in Beatrice caused by her having been removed from Italy. However, he stated that the effects of the removal might not show up immediately.

*7 Harrison also called Roe Chase Bernardini, a licensed clinical social worker, as an expert witness.[FN3]Bernardini has been Harrison's therapist since March 1999. Bernardini testified that when she first saw Harrison, Harrison was suffering from acute depression, disturbed sleep, anxiety, hypervigilance, and hyperarousal. Bernardini diagnosed her with "post traumatic stress disorder" ("PTSD"), a disorder she defined as "a syndrome of features that develop which are characterized by persistent and reoccurring [sic] intense feelings around the event of trauma."Tr. 643. She described the symptoms as: "intrusive

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 6
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

thoughts, images, ideation, reoccurring [sic] feelings, reliving the event or trauma or traumas, hyperarousal, acute relation-response, intense response reactions, startled response and fear of closeness, fear of intimacy, sexual contact, intimacy of any kind, and a person goes into a generalized feeling of numbing, and impairment in jobs, social and marital relations generally occurs and accompanies this."*Id.*

> FN3. The court limits its consideration of Bernardini's testimony to her analysis of Harrison's condition. Bernardini also gave an opinion as to the likelihood that Beatrice could suffer from a borderline personality if taken from her mother. The court cannot consider this testimony because Bernardini has not been shown to be an expert in this area.

Bernardini testified that Harrison's PTSD was "brought on" by Tabacchi's assaults. According to Bernardini, Harrison's symptoms abated completely by May or June 1999, and Bernardini, at that time, ceased making notes of her meetings with Harrison, although she continued seeing her several times a month thereafter.

Bernardini opined that Harrison "might reexperience PTSD," tr. 649, if she had to return to Italy where she might be reminded of her history of problems with Tabacchi and his family, even if Harrison had custody of Beatrice, her own car, and her own home.

## III. CONCLUSIONS OF LAW

### A. The Hague Convention

Italy and the United States are both signatories to the Hague Convention on the Civil Aspects of International Child Abduction ("Hague Convention" or "Convention"). The United States implemented the Convention in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* The Convention "is an international treaty designed to protect custody rights of parents on a global scale."*Meredith v. Meredith, 759 F.Supp. 1432, 1434 (D.Ariz.1991).*

Article 1 of the Convention states that the Convention's objective is "to secure the prompt return

of children wrongfully removed to or retained in any Contracting State and ... to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."If the court finds a child was wrongfully removed, Article 12 of the Convention provides that the court "shall order the return of the child forthwith."Wrongful removal or retention "include[s] a removal or retention of a child before the entry of a custody order regarding the child ...."42 U.S.C. § 11603(f)(2). Thus, to obtain relief, Tabacchi must show by a preponderance of the evidence that Beatrice was wrongfully removed from Italy or wrongfully retained in the United States. *See*42 U.S.C. § 11603(e)(1)(A).

*8 Under the Convention, a removal or retention is wrongful where:
a. it is in breach of rights of custody attributed to a person ... either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention Art. 3. This requires Tabacchi to show (1) that Italy was Beatrice's habitual residence at the time of the removal; (2) that he had custodial rights to Beatrice; and (3) that he was exercising his custodial rights at the time that Beatrice was removed from Italy.

This court's task is a limited one. The court does not judge the merits of the parties' custody claims but determines only whether the minor child was wrongfully removed from Italy or wrongfully retained in the United States and, if so, whether any of the Convention's exceptions to mandatory return apply. Hague Convention Art. 19; 42 U.S.C. § 11601(b)(4); *Friedrich v. Friedrich, 983 F.2d 1396, 1400 (6th Cir.1993)* ("Friedrich I"); *Rydder v. Rydder, 49 F.3d 369, 372 (8th Cir.1995); Feder v. Evans-Feder, 63 F.3d 217, 221 (3d Cir.1995).*

### B. Wrongful Removal or Retention

#### 1. Habitual Residence

The Convention does not define the term "habitual

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 7
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

residence." In defining the term, American courts frequently look to a case from the United Kingdom, *Re Bates,* No. CA 122.2-89, High Court of Justice, Family Division Court, Royal Court of Justice, United Kingdom, 1989.[FN4]*See Feder, 63 F.3d at 223;Friedrich I, 983 F.2d at 1401;Slagenweit v. Slagenweit, 841 F.Supp. 264, 268 (N.D.Iowa 1993).Bates* was quoted at length in *Feder* and the language is instructive:

> FN4. Although decisions of a court in a foreign country have no precedential weight, such decisions are properly considered when construing the terms of an international convention. *See Air France v. Saks,* 470 U.S. 392, 404 (1985) (interpreting the word "accident" under the Warsaw Convention).

[T]here must be a degree of settled purpose. The purpose may be one or there may be several. It may be specific or general. All that the law requires is that there is a settled purpose. That is not to say that the [person] intends to stay where he is indefinitely. Indeed his purpose while settled there may be for a limited period. Education, business or profession, employment, health, family or merely love of the place spring to mind as common reasons for a choice of regular abode, and there may well be many others. All that is necessary is that the purpose of living where one does has a sufficient degree of continuity to be properly described as settled.
*Feder, 63 F.3d at 223* (*quoting Re Bates,* slip op. at 10). Habitual residence can be changed only by "a change in geography and the passage of time, not by changes in parental affection and responsibility. *The change in geography must occur before the questionable removal....*"*Friedrich I, 983 F.2d at 1401-02* (emphasis added)."[T]he court must focus on the child, not the parents, and examine past experience, not future intentions."*Friedrich I, 983 F.2d at 1401.*

*9 Applying these principles to the present case, the court finds that Beatrice's residence in Italy was settled and that Italy was her habitual residence. There is no question that aside from a few vacations and trips to London for Harrison's work, Beatrice had not been outside of Italy and away from her place of birth, Palombara Sabina, from the time of her birth until she was removed on January 16, 1999. She was enrolled in school. She played with neighborhood

children. She was enrolled in the National Health Service and saw Italian doctors. Any plans that Harrison may have had to take Beatrice to the United States are irrelevant because they relate to future intentions. *See Friedrich I, 983 F.2d at 1401.*

2. Tabacchi's Exercise of Custody Rights in Beatrice Prior to her Removal

Next the court must determine whether Tabacchi's custody rights under the laws of the state of Beatrice's habitual residence, Italy, were breached by her removal and whether Tabacchi was exercising his custody rights at the time of her removal. *See Friedrich I, 983 F.2d at 1402.* "The Convention ... only provides the remedy of return of the child when the child has been removed in violation of the non-consenting parent's right of custody, and does not provide this relief if the non-consenting parent had only a right of access, rather than a right of custody."*Croll v. Croll,* 99 C 3566, 1999 U.S. Dist. LEXIS 16063, *9 (S.D.N.Y. Oct. 19, 1999) (citations omitted). Harrison does not dispute that Tabacchi had custody rights when Beatrice was taken from Italy. Therefore, the court need determine only whether Tabacchi was exercising those rights at the time.

It is undisputed that Tabacchi was significantly involved in Beatrice's care while she was in Italy. He fed her, bathed her, played with her, gave her medication, and performed other parental duties. He and Harrison made decisions regarding Beatrice's health and education together. Tabacchi has thus met his burden of showing that he was exercising his custody rights and that the removal of Beatrice from Italy and her retention in the United States are in breach of those rights. *See Friedrich I,* 78 F.3d at 1066 ("[S]hort of acts that constitute clear and unequivocal abandonment of the child," a parent should be found to have exercised his or her custody rights under the Convention.). Beatrice must be returned to Italy pending the permanent resolution of the question of custodial rights, absent some exception provided in the Convention.[FN5]

> FN5. Harrison moved to dismiss this case arguing that the custody issues had already been decided by the Italian court in its ruling of July 24, 1999, granting Harrison temporary custody. This court must assess the elements of wrongful removal as of the

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

time the child was taken from the state of habitual residence. *See* Hague Convention Art. 3 (Removal is wrongful when it "is in breach of rights of custody attributed to a person ... either jointly or alone, under the law of the State in which the child was habitually resident *immediately before* the removal or retention ....") (emphasis added). Here that is January 1999. At that time both parents had equal rights of custody, as respondent stipulated. Moreover, the Italian court's decision did not involve a final resolution of custody but merely granted Harrison *temporary* custody, "without prejudice to the necessity and the urgency of an in depth technical evaluation of the parental fitness of both parties and the effect of the sudden change of residence of the mother on the psychological and physical development of the minor ...." Pet. Ex. 2B The Italian court held that the solution that "seems best to guarantee a reconciliation of the [parents' and the child's] interests, is to give custody of the minor to the mother with the obligation for the same to bring the child to Italy in order to allow an adequate stay of the child with the father in the environment where she grew up since her birth ...." *Id.* Accordingly, Harrison's motion to dismiss on this basis must be denied.

C. Defenses

The Convention provides four exceptions to the mandatory return of a wrongfully removed or retained child. ICARA makes clear that these four exceptions are to be construed narrowly. 42 U.S.C. § 11601(a)(4). "Were a court to give an overly broad construction to its authority to grant exceptions under the Convention, it would frustrate a paramount purpose of that international agreement-namely, to 'preserve the status quo and to deter parents from crossing international boundaries in search of a more sympathetic court.' " *Blondin v. Dubois*, 189 F.3d 240, 246 (2nd Cir.1999). Indeed, even if one of the exceptions applies, while the court is not bound to return the child, it may still find it appropriate to do so if it would further the aims of the convention. *See Blondin*, 189 F.3d at 246, n. 4 (*citing Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir.1996) ("Friedrich II")). Harrison raises two defenses arising

under ICARA and the Convention: (1) Tabacchi consented and/or acquiesced to the removal of Beatrice from Italy and her retention in the United States; and (2) returning the child to Italy presents a grave risk of physical and/or psychological harm.

1. Consent and Acquiescence

*10 Article 13(a) of the Convention and ICARA provide that the court is not bound to order the return of the child if the respondent establishes by a preponderance of the evidence that the petitioner "consented to or subsequently acquiesced in the removal or retention" of the child. Hague Convention Art. 13(a); 42 U.S.C. § 11603(e)(2)(B). Neither the Convention nor ICARA define the terms "consent" or "acquiescence," and there is no guidance in the legislative history. *See Friedrich II, 78 F.3d at 1069, n. 11.*

Harrison argues that Tabacchi consented to the removal of Beatrice from Italy. She testified that on January 15, 1999, Ugo Laurenti told her that Tabacchi told him that he would consent to Harrison' taking Beatrice to the United States for three months if she "signed something." Harrison testified that she did not know what "something" meant. Nonetheless, Harrison argues that the postcard she sent from the Italian airport on January 16, 1999, as she was leaving with Beatrice for London, constituted the written instrument that Tabacchi requested. She also argues that Tabacchi's statement "Deirdre can go to Jo's," which he made on the morning of January 15, when he saw her packing her things in the car, constitutes evidence of consent. Josephine Campbell lived about one kilometer from Tabacchi and Harrison's residence.

This hardly amounts to permission to leave the country with Beatrice and, in the context of all the evidence in the case, is a frivolous contention. The incidents occurring on January 15, suggest exactly the opposite of consent: Tabacchi took the keys from the car and questioned Harrison about where she was going when he saw her packing the car. He went to Campbell's house to get Beatrice because he thought Harrison was taking her away and got into an altercation with Harrison and her mother over the issue. On that very day, Tabacchi attempted to charge Harrison with abduction and attempted to get help from legal authorities to prevent Harrison from

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 9

leaving Italy with Beatrice. Harrison left Italy without telling Tabacchi where she was going with Beatrice or when she would return; and she did not speak with Tabacchi before she left, even as Tabacchi was trying to find her.[FN6]

> FN6. Even if Tabacchi had indicated his willingness to allow Harrison to take Beatrice to the United States for three months, as Harrison claimed, he made clear that the child had to be returned to Italy. Even on these facts, Harrison would clearly be liable for wrongful retention of Beatrice in the United States.

Other courts have rejected the defense of consent on similar facts. In *Friedrich II,* the Sixth Circuit affirmed the district court's finding that the petitioner had not consented to the removal of the minor child from the state of habitual residence, Germany. The respondent mother based her claim of consent on statements that she claimed the petitioner father had made during their separation. The father denied granting such consent. The district court found for the father and the Sixth Circuit affirmed, noting that Mr. Friedrich's testimony as to lack of consent was supported by the fact that Mrs. Friedrich removed the child without informing Mr. Friedrich of her intended departure from Germany. *Friedrich II, 78 F.3d at 1069.*

*11 Similarly, in *Croll v. Croll, supra,* the district court rejected the mother's assertion that the father had consented to her removal of their child from Hong Kong to the United States. The custody order issued in Hong Kong provided that Mr. Croll could request that the immigration department not issue the child a passport without his consent. Ms. Croll argued that his failure to take such actions constituted consent. Ms. Croll also testified that she and Mr. Croll had discussed moving to the United States and that he allegedly agreed that it would be beneficial to the child. Mr. Croll denied such an agreement. The court held that because of the conflicting testimony along with the petition for return of the child that the father had filed within a few weeks of the child's removal, Ms. Croll had failed to prove consent. *Id.* at * 17.*But see Krishna v. Krishna,* 97 C 0021, 1997 U.S. Dist. LEXIS 4706, *10-11 (N.D. Cal. April 11, 1997) (consent found where petitioner freely provided respondent with the child's passport after a

discussion he had with one of respondent's relatives who informed him of respondent's intention to come to the United States; by handing over the child's passport the petitioner had implicitly or explicitly consented to the child's removal).

As in *Croll* and *Friedrich II,* the evidence of consent here does not satisfy the preponderance of the evidence standard. Tabacchi's persistent attempts to keep Beatrice in Italy on January 15, 1999 and his subsequent filing of the Hague petition undermine Harrison's claim of consent.

Harrison also seeks relief under Article 13b's defense of acquiescence, asserting that Tabacchi acquiesced in the child's retention in the United States. Acquiescence under the Convention requires "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time."*Friedrich II, 78 F.3d at 1070* (internal footnotes omitted). The court rejects the contention that Tabacchi acquiesced in Beatrice's removal from Italy and retention in the United States. All of the evidence is to the contrary.

Harrison bases her claim of acquiescence on the following facts: Tabacchi mailed her and Beatrice gifts and flowers in the United States; Tabacchi sent her a check for $580 at her request; Tabacchi talked with Harrison about visiting and inquired about work in the United States; and Tabacchi did not file his Hague petition until June 22, 1999. These facts are insufficient to constitute the unequivocal acquiescence required to satisfy Article 13b. While Tabacchi was sending gifts and offering financial support, he filed complaints with the police against Harrison for child abduction; he filed for custody in the Italian courts; he asked Harrison to bring Beatrice back to Italy several times; and most importantly, he pursued his petition in this court. Tabacchi has been fighting to get his daughter back since the day she was taken from Italy. *See Wanninger v. Wanninger, 850 F.Supp. 78, 81-82 (D.Mass.1994); see also Friedrich II, supra.*

2. Grave Risk

*12 The Convention and ICARA provide that an order of return is not mandatory if the respondent

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 10
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

proves by clear and convincing evidence that "there is a grave risk that [the child's] return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."Hague Convention Art. 13(b); 42 U.S.C. § 11603(e)(2)(A). The exception is to be narrowly construed; the potential harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another."*Friedrich II, 78 F.3d at 1068* (*quoting In re A.,* 1 F.L.R. 365, 372 (Eng.C.A.1988)); *see also Nunez-Escudero,* 58 F.3d at 377;*Rydder, 49 F.3d at 373.* In *Friedrich II,* the Sixth Circuit limited the exception to the following situations:

First, there is a grave risk of harm when return of the child puts the child in imminent danger prior to the resolution of the custody dispute-e.g., returning the child to a zone of war, famine, or disease. Second, there is a grave risk of harm in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence ... may be incapable or unwilling to give the child adequate protection.

*Id.* at 1069.[FN7]

> FN7. The court notes that an order of return does not amount to an order handing the child to the petitioner. The determination of which parent should have custody pending a final custody determination is a matter for the tribunal in the state of habitual residence. *See Ciotola v. Fiocca,* 684 N.E.2d 763, 770 (Ohio Ct. of Common Pleas 1997) (*citing Tyszka v. Tyszka,* 503 N.W.2d 726 (Mich.Ct.App.1993)). Here, the Italian courts have awarded temporary custody to Harrison.

"The exception for grave harm to the child is not license for a court in the abducted-to country to speculate on where the child would be happiest."*Friedrich II,* 78 F.3d at 1068. *See also Nunez-Escudero v. Tice-Menley,* 58 F.3d 374, 377 (8th Cir.1995) ("The Article 13b inquiry does not include an adjudication of the underlying custody dispute ...."). "It is not relevant to this Convention exception who is the better parent in the long run, or whether [Harrison] had good reason to leave her home in [Italy] and terminate her marriage, or whether [Harrison] will suffer if the child she

abducted is returned to [Italy]."*Nunez-Escudero, 58 F.3d at 377.* Nonetheless, the court's inquiry "must encompass some evaluation of the people and circumstances awaiting [the] child in the country of [her] habitual residence."*Id. See also* Hague Convention Art. 13 (the court "shall take into account the information relating to the social background of the child"). If those circumstances and individuals create an intolerable situation, this court will not order the child's return to Italy.

Harrison asserts that she and Beatrice would be at grave risk of physical and psychological harm if Beatrice was returned to Italy. To support her assertion, Harrison points to Tabacchi's history of physical and verbal abuse of Harrison. Tabacchi slapped her at least three times, hit her on the head with his fist at least twice, grabbed at her waist and threw her down at least once, allegedly choked her briefly, and hit her in the face with his arm, pushing her down. Harrison also testified to their heated arguments and his rages in which he smashed household items.[FN8]

> FN8. The record does not support the allegations of one-sided verbal abuse. Both Harrison and Tabacchi yelled, screamed, and swore at each other regularly. The record indicates that Harrison threw objects too.

*13 Based upon the evidence, the primary risk of physical harm is to Harrison, not to Beatrice. Beatrice was present on only two of these occasions. She was in the car when Tabacchi allegedly attempted to choke Harrison. She was being held by Tabacchi when he hit Harrison in the face with his arm. Beatrice was not harmed during any of these altercations. Tabacchi never struck Beatrice and he yelled at her only when she disobeyed, as did Harrison. Harrison's testimony regarding her discovery of a bump on Beatrice's head after Tabacchi had been holding her is not probative because Harrison did not know how the bump got there. Her assumption that Tabacchi caused it is mere speculation. Similarly, Harrison's testimony regarding the occasion on which Tabacchi briefly shook Beatrice for a few seconds does not establish that Beatrice would be at physical risk were she returned to Italy. Harrison admitted that Tabacchi did not shake the baby hard and that he stopped when she

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

told him to do so.

Since she has been in Chicago, Beatrice has visited with Tabacchi several times and stayed overnight with him on at least two occasions. Although Tabacchi's behavior toward his wife is unacceptable, to qualify as a grave risk of harm under the convention, the risk must be to the child. *See Rodriguez v. Rodriguez,* 33 F.Supp.2d 456 (D.Md.1999) (denying petition where petitioner beat mother and physically and psychologically abused son; Venezuelan police were unresponsive to mother's pleas for help; children suffered from post traumatic stress disorder as a result of petitioner's conduct); *Turner v. Frowein,* No. FA-97-0084450 (Conn.Super. Ct. June 24, 1998) (denying petition where there was overwhelming evidence that father had sexually molested his son). The evidence shows that even if Beatrice were sent back to Italy to stay with Tabacchi pending the resolution of the custody issues, there would not be a grave risk of physical harm. *See Croll v. Croll,* 1999 U.S. Dist. LEXIS 16063 (S.D.N.Y.1999); *In re Walsh,* 31 F.Supp.2d 200, 206 (D.Mass.1998).

The court must also consider whether there is a grave risk of psychological harm to Beatrice. Harrison contends that there are two potential sources of grave psychological harm. First, if Harrison returns to Italy as Beatrice's primary caretaker, Beatrice will likely be exposed to her father's rages and abuse of her mother. Dr. Ravitz testified that Beatrice would be at increased risk of psychological harm if her father were hostile to her mother in her presence. Courts have found grave risk based on the psychological harm of being in an environment in which one parent was being abused. For example in *Krishna v. Krishna,* the court found grave risk of psychological harm where the father allegedly beat the mother regularly. 97 C 0021, 1997 U.S. Dist. LEXIS 4706 (N.D. Cal. April 11, 1997). The mother left Australia with their child after an argument with the father in which he slapped her across the face and threatened her with a knife and belt. The court held that although there was little risk of physical harm to the child, there was "compelling evidence establishing the potential for serious psychological harm."*Id.* at *9.

*14 Since Harrison has been in Chicago with Beatrice, Tabacchi and Harrison have arranged visits without any difficulties. There is no evidence that

Tabacchi has harassed Harrison or abused her. There is nothing in the record to suggest that Tabacchi would not obey protective orders issued in Italy. The court finds no reason to believe that Harrison and Tabacchi could not co-exist in Italy pending the resolution of the custody proceedings as long as they were not living together.

Second, Harrison claims that Beatrice faces a grave risk of psychological harm and an intolerable situation if she is separated from her mother. Harrison asserts that if she returns to Italy, she faces criminal prosecution because of Tabacchi's complaints. Thus, Harrison argues, even if she returned to Italy with her daughter, they would be separated because Harrison would be jailed.

The evidence, including Dr. Ravitz' testimony, supports the claim that if Beatrice were separated from her mother, she could be emotionally injured, although even Dr. Ravitz conceded that any injury would be mitigated if Beatrice's relationship with her father were strong. Indeed, in the Italian separation proceedings, the Italian court ruled that Beatrice should be with her mother until the question of custody can be definitively resolved, stating that Beatrice, "because of her young age, [had] a privileged relationship with her mother, about whom at the present moment [the court has not] ascertained any relevant aspects of unfitness to be a parent with whom the child has lived since her birth."Pet. Ex. 2B.

The cases are in conflict as to whether psychological harm stemming from the separation of the child from the abducting parent is sufficient in itself to constitute a grave risk of harm, but the majority of cases have concluded that it is not sufficient. *See Friedrich II,* 78 F.3d 1060 ("The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be a 'grave' risk of harm for the purposes of the Convention"); *Nunez-Escudero,* 58 F.3d at 377 (reversing district court's denial of petition and remanding for further findings where court considered the possible separation of the child from his mother in determining that there was a grave risk of harm to the child); *see also Rydder v. Rydder,* 49 F.3d 369, 373 (8th Cir.1995); *Ciotola,* 684 N.E.2d at 769. *But see Steffen F. v. Severina P.,* 966 F.Supp. 922, 926-27 (D.Ariz.1997); *B. v. B.,* Family Ct. of Westerburg, No. 4 F 303/98 (Sept. 29, 1992) (best

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 12

interests of child required court to deny petition because there was a danger of psychological problems if the child was taken away from its current familiar environment in the abducted-to country).

Even assuming that grave risk of psychological harm would be caused by the separation of the child from the mother, no court has allowed the pendency of criminal proceedings in the home country to justify failure to return the child to the country of habitual residence. Harrison relies on *Pantazatou v. Pantazatos,* No. 713571 (Conn. Superior Ct. April 29, 1997), asserting that the Connecticut court refused to return the child, finding a grave risk of harm stemming from the fact that the mother faced a possible contempt order if she returned to Greece (the state of habitual residence) and that she lacked means to support herself and the child there. Harrison fails to note that the Connecticut court stated that the "mother could not take advantage of that situation by not going with the child to Greece, provided, however, that there were reasonable undertakings by the husband which would protect her and the child."*Pantazatou v. Pantazatos,* No. FA 96713571, 1997 WL 614572, *1 (Conn.Super.Ct. Sep. 24, 1997)("Pantazatou II") (supplemental decision, discussing previous order). The court ordered the return of he child a few months later, on September 24, 1997, in a supplemental decision. The court's order was contingent upon undertakings that required the father to drop the criminal charges and refrain from pursuing contempt actions that could result in the separation of the mother from the child. *Id.* at *3. The court also required the petitioner to pay the respondent's and the child's living expenses in Greece pending the resolution of the custody proceedings. *Id.* at *3. The court stated that its order was not effective until the petitioner proved that the Greek court entered an order substantiating the undertakings. *Id.* at *4.*See also Pacicca v. Pacicca,* Family Court of New Zealand (1993) (petitioner agreed that he would not initiate criminal actions against the respondent after the children were ordered returned).

*15 Harrison also relies on *Turner v. Frowein,* No. 970084450, 1998 Conn.Super. LEXIS 3781, (Conn.Super. Ct. June 25, 1998). In *Turner,* the court denied the father's petition for return of his son to Holland. The respondent presented overwhelming evidence of the father's sexual abuse of the child.*Id.* at *16-20.While the court noted that the mother

feared criminal sanctions against her in Holland and that her prospects for employment in Holland were limited, these matters were not treated as dispositive. *See id.* at *20-21;*see also* Currier v. Currier, 845 F.Supp. 916 (D.N.H.1994) (granting petition despite criminal complaint against respondent in country to which child was being returned); *Croll, supra* (granting petition despite respondent's allegation that petitioner had a warrant issued for respondent's arrest).

Tabacchi testified that he instructed his attorney in Italy to drop all pending criminal charges against Harrison. No one in this case has presented evidence of Italian law, and the court is therefore without knowledge of the potential impact of the charges filed by Tabacchi (could they lead to incarceration for instance?) or the effect of his instruction to his attorney to drop them (can an individual complainant by dropping his charges stop the processes of the law he has already begun?). Since the burden is on respondent to prove by clear and convincing evidence that an order returning Beatrice to Italy would present a grave risk to the child, this absence of evidence must be construed against defendant; accordingly, the court cannot find that as a result of Tabacchi's complaints against Harrison, she would be separated from Beatrice were she to return to Italy with the child. On this record, risk to Beatrice has not been established based on the evidence concerning criminal charges filed by Tabacchi. The court will, however, require that Tabacchi sign an undertaking to be lodged with this court stating that he will take all steps within his lawful power to insure that Harrison is not criminally prosecuted for leaving Italy with Beatrice on January 16, 1999.

Finally, the court must "take into account any ameliorative measures (by the parents and by the authorities of the state having jurisdiction over the question of custody) that can reduce whatever risk might otherwise be associated with a child's repatriation."*Blondin,* 189 F.3d at 248;*see id.* at 249 (reversing the denial of the petition based on grave risk to children if they were returned to the petitioner's care in France because the district court failed to consider other arrangements that might be available for returning the children to France). Harrison does not claim that the Italian authorities were unresponsive to her complaints. She called the police for the first time on the last day that she was in

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 13

Italy, January 15, 1999, and they responded, albeit 45 minutes later. She testified that she fears the police will be unresponsive if she has problems with Tabacchi if she returns to Italy. She also testified that she fears "bureaucratic intimidation" in Italy in that Tabacchi's father, Giunio, may use his influence in the community to interfere with her ability to work and obtain necessary documents. Harrison has presented no evidence that Giunio ever used whatever influence he may have to harm her or hinder her in any way. Rather, she testified to the assistance he has given her in obtaining a bank account and work documents. It is clear that there was no undue interference with the Italian court's treatment of the custody dispute to date because the Italian court granted her, not Tabacchi, temporary custody of Beatrice. Harrison has failed to demonstrate that the Italian authorities would not adequately protect her and Beatrice.

*16 The court finds that Harrison has not shown grave risk of psychological and/or physical harm by clear and convincing evidence. Assuming that Tabacchi provides evidence satisfactory to the court that he can provide adequate housing separate from him as well as living expenses for Harrison and Beatrice pending resolution of the custody proceedings in Italy, the court will issue an order of return. See *Feder, 63 F.3d at 226* (remanding and ordering district court to investigate adequacy of undertakings to ensure that minor child does not suffer short term harm).*See also Croll,*1999 U.S. Dist. LEXIS 16063, at *22; *In re Walsh, 31 F.Supp.2d at 207;Pantazatou II, supra; Re O,*2 FLR 349 (U.K.Fam.1994) (exacting undertakings is appropriate under Convention). Tabacchi must also provide an undertaking that he has dropped all charges against respondent in Italy and that he will take all steps within his lawful power to insure that Harrison is not criminally prosecuted for leaving Italy with Beatrice on January 16, 1999.

N.D.Ill.,2000.
Tabacchi v. Harrison
Not Reported in F.Supp.2d, 2000 WL 190576 (N.D.Ill.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.