10 of 10 DOCUMENTS

In re H. (MINORS) (ABDUCTION: CUSTODY RIGHTS)

In re S. (MINORS) (ABDUCTION: CUSTODY RIGHTS)

[CONSOLIDATED APPEALS]

[HOUSE OF LORDS]

[1991] 2 AC 476

**HEARING-DATES:** 23, 27 July 1990, 7, 8, May 13 June 1991

13 June 1991

**CATCHWORDS:**

Minor - Custody rights - Breach - Children resident in Ontario and California in mothers' custody - Taken out of jurisdiction by fathers without mothers' knowledge in breach of court orders - Whether wrongful "retention" or "removal" - Whether wrongful retention single event - Canada and United States subsequently acceding to Hague Convention on child abduction - Whether Convention applicable - Child Abduction and Custody Act 1985 (c. 60), s. 2(2), Sch. 1, art. 3

**HEADNOTE:**

In the first appeal, the father of two children who were Canadian nationals and in the custody of their mother had failed to return the children to their mother after a period of access and, without her knowledge and in breach of an order of the Supreme Court of Ontario, had taken them outside the jurisdiction to India and later to England. The mother, having discovered her childrens' whereabouts, applied to the High Court in England for their return to Canada under the Child Abduction and Custody Act 1985 n1 which gave effect to the 1980

> n1 Child Abduction and Custody Act 1985, s. 2(2): see post, p. 496G-H.
>
> Sch. 1, art. 3: see post, pp. 494H-495B.

Hague Convention on the Civil Aspects of International Child Abduction.   The judge dismissed the application, and the Court of Appeal upheld his decision, on the ground that the childrens' removal had occurred before the date upon which Canada, in relation to the Province of Ontario, had become a contracting state for the purposes of the Act, by an Order in Council which made no special provision for retrospectivity, and that their subsequent presence in the United Kingdom did not constitute a continuing "retention" within the meaning of the Convention.

In the second appeal, the father of two American children in the custody of their mother had similarly failed to return them after a period of access and, without the mother's knowledge and in breach of an order of a Californian court, had taken the children outside the jurisdiction to England. The mother applied to the High Court for the return of her children under the Act. The judge held that since the children had been taken from the United States before it had become a contracting state, she was bound by the decision of the Court of Appeal to hold that the Act and the Convention did not apply.

On appeals by the mothers:-

Held, dismissing the appeals, that on a true construction of the Convention, both removal and retention of a child in breach of custody rights were single events occurring on a specific occasion; that removal, being the removal of a child from the jurisdiction of the state of its habitual residence and retention, being the retention of a child lawfully removed for a limited period from the jurisdiction but not returned on the expiry of that period, were mutually exclusive concepts under the Convention; and that, accordingly, since the children in both appeals had been removed from the states of their habitual residences on dates prior to the coming into force of the Convention, the court had no jurisdiction under section 2(2) of the Act of 1985 to order their return (post, pp. 491F, 499F-G,500B-C, D-E, 501B-F).

Exhibit A

Decisions of the Court of Appeal, post, pp. 481B et seq.; [1991] 2 W.L.R. 62; [1991] 1 All E.R. 836 and of Booth J., post, p. 489G affirmed.

## INTRODUCTION:

In re H. (Minors) (Abduction: Custody Rights)

APPEAL from Anthony Lincoln J.

On 11 July 1990 Anthony Lincoln J. dismissed the mother's application for the return of her sons, T. and J., to her custody and to the jurisdiction of the Ontario Court pursuant to the Child Abduction and Custody Act 1985 and the 1980 Hague Convention on the Civil Aspects of International Child Abduction (Cmnd. 8281). The mother appealed on the grounds that (1) the judge was wrong in law in holding that the father's retention of the children in or after March 1986 was not a wrongful retention to which the Act of 1985 applied; (2) the judge was wrong in law in holding that a retention within the terms of the Act and the Convention, and in particular within the terms of section 2(2), was not a continuing act but one which occurred only on the date when the retention began; (3) the judge was wrong in law in holding that there was no wrongful retention occurring on or after the date on which the Act came into force in the United Kingdom; (4) the judge was wrong to

give undue weight to provisions in respect of time limits in the Convention in his interpretation of the Convention and of section 2(2) of the Act; and (5) the judge was wrong in law in that he failed to give sufficient weight, in his interpretation of the nature of a wrongful retention in the terms of the Convention and of section 2(2) of the Act, to the purposes of the Act and the Convention.

The facts are stated in the judgment of Lord Donaldson of Lymington M.R.

In re S. (Minors) (Abduction: Custody Rights)

21 August 1990. The Lord Chancellor having authorised the issue of proceedings in the Family Division on her behalf, Mrs. S., a citizen of the United States of America, sought by originating summons the return to her custody and to the jurisdiction of the Californian Court, pursuant to the Child Abduction and Custody Act 1985 and the Convention, of her daughters B. and A., taken to England by her former husband, Mr. S. Booth J. granted an ex parte order to that effect and listed the matter for hearing inter partes on 24 August.

28 August. Booth J. dismissed the application on the ground that, following In re H. (Minors) (Abduction: Custody Rights), ante, p. 481B, the court had no jurisdiction under the Act of 1985 and the Convention. The judge granted a certificate pursuant to section 12 of the Administration of Justice Act 1969 that a sufficient case for an appeal to the House of Lords under Part II of the Act had been made out to justify an application for leave to be made before the House.

31 October 1990. The Appeal Committee of the House of Lords (Lord Bridge of Harwich, Lord Templeman and Lord Ackner) allowed Mrs. S.'s petition for leave to appeal.

28 November 1990. The Appeal Committee of the House of Lords (Lord Bridge of Harwich, Lord Ackner and Lord Lowry) allowed Mrs. H.'s petition for leave to appeal.

Mrs. H. and Mrs. S. appealed.

## COUNSEL:

Nicholas Wall Q.C. and Henry Setright for the mother. The words "removal" and "retention" in article 3 of the 1980 Hague Convention on the Civil Aspects of International Child Abduction, incorporated into the Child Abduction and Custody Act 1985, are not coterminous. The act of abduction takes place as soon as a child is removed, in breach of custodial rights or a court order, from the jurisdiction of the court where he has habitually lived. Removal from the care of the parent enjoying custodial rights, but not from the jurisdiction, is not within article 3. Retention, consistently with the normal meaning ascribed to it (see the Oxford English Dictionary), is not a single event, but a continuing process. It is not confined to an act retaining a child after a period of lawful access. Every wrongful removal is followed by a wrongful retention until the child is returned.

The children were removed from the mother's custody and from the jurisdiction of the Ontario court in March 1985 and then retained by the father. On the coming into force of the Convention between the United Kingdom and Canada on 1 August 1986, their retention became unlawful and the provisions of the Convention became applicable. Thus, for

the purposes of article 12 of the Convention, time began to run as at that date. There is therefore no contradiction between the concept of continuing retention and article 12. The fact that more than one year has elapsed from the date of the wrongful removal or retention does not make the argument inconsistent with In re S. (A Minor) (unreported), 18 May 1990; Court of Appeal (Civil Division) Transcript No. 475 of 1990.

Retention as here defined is consistent with the purpose of the Convention, namely, to enable the court to exercise its jurisdiction in respect of as many children as were unlawfully retained as at 1 August 1986, subject to the temporal safeguards provided by articles 12 and 13. There is no binding authority defining "wrongful retention." If, as suggested in In re J. (A Minor) (Abduction: Custody Rights) [1990] 2 A.C. 562, 571, the words may apply to situations other than retention after lawful access, then the present case falls within article 3. If retention is defined not as a continuous process, but as a single event, then such an event occurred on the date when the Convention first took cognisance of it, namely, 1 August 1986, so that article 3 would still apply.

Paul Focke Q.C. and Edward Fitzgerald for the father. Provision was made by section 2(2) of the Child Abduction and Custody Act 1985 and an Order in Council for the date on which the Convention was to come into force between the United Kingdom and Canada. There is no

provision in the legislation for retrospectivity, although such a provision could have been made. The Convention therefore applies to wrongful removals and retentions occurring on or after the specified date, namely 1 August 1986. Both events took place long before the Convention came into force.

"Retention" means non-return of the children to the person having rights of custody over them under the law of the state of their habitual residence after a temporary period of lawful access or possession enjoyed by some other party in another jurisdiction: see In re E. (A Minor) (Abduction)[1989] 1 F.L.R. 135 and In re J. (A Minor) (Abduction: Custody Rights)[1990] 2 A.C. 562.

The children were wrongfully removed when the father took them abroad in March 1985 during a period of access which was only lawful while they remained in Canada. Their presence in any other jurisdiction is properly to be characterised throughout as following an unlawful removal. There never was an unlawful retention because there was no period of lawful possession outside Canada which subsequently became unlawful so as to become a retention within the meaning of the Convention. A retention cannot follow a removal. As the disjunctive "or" in article 3 suggests, those terms are mutually exclusive and provide independent grounds for activating the Convention. The mother can therefore only rely on the father's removal and that took place long before the Convention came into force.

Alternatively, if the father's failure to return the children after the period of access is to be characterised as a wrongful retention within the Act, the language and purpose of section 2(2) and the articles, particularly 3 and 12, indicate that the unlawful act is constituted by a single event, not a continuing process. The words "removals or retentions" both refer to events occurring at chronologically identifiable points. Unlawful removal occurs at the date the child is removed from the jurisdiction. Unlawful retention occurs because there has been retention beyond the legitimate period of access. If retention were a continuous process, every unlawful removal would turn into an unlawful retention of indefinite duration, and there would be no purpose in providing that Orders in Council should specify a date for the purpose of excluding abductions or retentions prior to its commencement. For the purposes of article 12, time starts to run from an identifiable point. The whole operation of the 12-month rule depends on identifying that point of time. The mother's construction would render the 12-month rule pointless: see In re S. (A Minor) (unreported), 18 May 1990; Court of Appeal (Civil Division) Transcript No. 475 of 1990.

The purpose of the Convention is to provide for the peremptory return of abducted children only when application is made for a remedy within a reasonable time after the initial breach of custody rights in the jurisdiction of habitual residence. That is the purpose underlying articles 12 and 13. It will be inconsistent with that purpose to allow the remedy of peremptory return to be available years after the initial breach of custody rights relied on by the mother.

Wall Q.C. replied.

Lord Donaldson of Lymington M.R. announced that the appeal would be dismissed for reasons to be given later.

Cur. adv. vult.

27 July. The following judgments were handed down.

James Munby Q.C. and Henry Setright for Mrs. H. and Mrs. S. "Retention" in article 3 of the Hague Convention on the Civil Aspects of International Child Abduction is capable of being a continuing state of affairs, for the ordinary and

natural meaning of "retain" is "hold fast, detain, keep hold of, or continue to have." Thus, the words "from the date of the wrongful . . . retention" in article 12 are to be read as meaning "from the commencement of the wrongful retention." It is not necessary to treat retention as a single event in order to make the Convention work. This approach is consistent with foreign jurisprudence: see In the marriage of W. M. and G. R. Barraclough (1987) 11 Fam. L.R. 773; In the marriage of J. G. Gollogly and E. A. Owen (1989) 13 Fam.L.R. 622; Navarro v. Bullock(unreported), 1 September 1989, Superior Court of California; Sheikh v. Cahill (1989) 546 N.Y.S. 2d 517; Widlund v. Widlund (unreported), 7 December 1989, District Court of Minnesota and Palle v. Palle (unreported), 23 February 1990, Circuit Court of Illinois.

In construing an international convention, the courts should not employ the same rigorous principles as would be applied to a domestic statute: see C. v. C. (Abduction: Rights of Custody) [1989] 1 W.L.R. 654, 663D-E; Fothergill v. Monarch Airlines Ltd. [1981] A.C. 251 and B. v. B. (Minors: Enforcement of Access Abroad) [1988] 1 W.L.R. 526. A purposive construction should be adopted.

"Removal" and "retention" are not mutually exclusive concepts. A parent who wrongfully takes a child and thereafter continues to hold that child is guilty of both removal and retention. Although the Convention refers throughout to "removal or retention," the word "or" is not there used disjunctively but used as shorthand for "and/or." Viola v. Viola, 1988 S.L.T. 7 and Kilgour v. Kilgour, 1987 S.L.T. 568 suggest that removal and retention are not necessarily mutually exclusive. Where a parent has wrongfully taken a child and continues to hold that child there is "retention" so long as that state of affairs continues. Whether or not there had been wrongful removal there was, therefore, in each case wrongful retention on the dates when the Act and the Convention came into force as between the United Kingdom and the relevant contracting state. In any event, removal or retention becomes wrongful for the purposes of the Act and the Convention only when the Convention comes into force as between the United Kingdom and the relevant contracting state. Finally, removal and retention relate to removal or retention adverse to the rights of custody and not to removal or retention out of the relevant jurisdiction.

A practical consequence of the contrary view taken by the majority in the Court of Appeal is that attention is focused on a date that is often not within the knowledge of the innocent party: see article 3(b) of the Convention. [Reference was also made to In re J. (A Minor) (Abduction:

Custody Rights) [1990] 2 A.C. 562; In re E. (A Minor) (Abduction)[1989] 1 F.L.R. 135; In re S. (A Minor) (unreported), 18 May 1990; Court of Appeal (Civil Division) Transcript No. 475 of 1990 and In re Mahaffey (A Minor) (unreported), 8 October 1990.]

Paul Focke Q.C. and Edward Fitzgerald for Mr. H. The Convention is not designed to provide an absolute remedy in every case. It seeks to prevent or discourage cross-border kidnapping and to discourage forum shopping. The typical situation at which the Convention is aimed is that in which the child is removed from the country of the original jurisdiction without the consent of the parent with custody, i.e. wrongful removal.

The inclusion of wrongful retention was intended to cover cases where the child has been lawfully removed from the jurisdiction but not retained: see the Explanatory Report to the Convention and Reg. v. Secretary of State for the Home Department, Ex parte Read [1989] A.C. 1014, 1052. Removal and retention are accordingly mutually exclusive concepts. The case was one of wrongful removal and not wrongful retention: see, ante, p. 486A-C, per Lord Donaldson of Lymington M.R. and pp. 488G-489C, per Sir Roger Ormrod. It is clear from the language of the Convention that the words "removal or retention" are parallel words and are both intended to refer to an event that occurs at a chronologically identifiable point rather than a continuous process of indefinite duration. Time therefore runs from the date when the child crosses an international boundary into a contracting state. Accordingly, even if this was a case of retention, the retention occurred some five months before the date of the coming into force of the Convention as between the United Kingdom and Ontario. The case falls outside the temporal scope of the Convention.

Fitzgerald followed.

Mr. S., in person, adopted the argument submitted on behalf of Mr. H.

Munby Q.C. replied.

Their Lordships took time for consideration.

13 June.

**PANEL:** Lord Donaldson of Lymington M.R., Stuart-Smith L.J. and Sir Roger Ormrod Lord Bridge of Harwich, LordBrandon of Oakbrook, Lord Griffiths, Lord Oliver of Aylmerton and LordJauncey of Tullichettle

**JUDGMENTBY-1:** LORD DONALDSON OF LYMINGTON M.R

**JUDGMENT-1:**

LORD DONALDSON OF LYMINGTON M.R: This appeal is concerned with the construction and application of the Child Abduction and Custody Act 1985, where the chain of events relied upon as rendering it applicable began before the Act was in force.

On 11 July 1990 Anthony Lincoln J. held that the Act had no application and the mother, with the assistance of the Lord Chancellor as the central authority under section 14(1) of the Act, appealed to this court. We dismissed that appeal on 23 July 1990, but took time to put our reasons into writing for delivery at a later date. This we now do.

I take the facts from the judge's judgment:

"This is a mother's application under the Child Abduction and Custody Act 1985 for the return of two children to the jurisdiction of Ontario under article 12 of the Hague Convention on the Civil Aspects of International Child Abduction. The two children are T., who was born in Canada on 13 August 1978, and J., also born in Canada on 18 October 1979. Both children have Canadian nationality.

"The mother was born in India and is a Canadian citizen. She currently lives in Indianapolis. She has converted to Christianity, whereas the father is a Sikh. He, too, was born in India. He migrated to England in the mid-1960s. They are an educated couple, he being an electronic engineer. They married in 1974 in Nottingham. They emigrated to Canada in 1976, where, as I have said, the two boys were subsequently born. In 1982 the father took the children away from the matrimonial home to England. This was the first of a number of removals. The couple resumed cohabitation, and again in 1983 the same thing happened. On this occasion, the father sent the children to India. But some five months after their removal he returned the children to Canada. The marriage was not a happy one at this stage in 1983, and in January 1984 the mother left home, taking the two boys with her to a women's shelter in Toronto. There she obtained an immediate ex parte order from the Toronto court for interim custody of the children. On 20 September 1985 Judge Michael Bollan, sitting in the Supreme Court of Ontario, made an order under which, among other things, he gave custody of both children to the mother, with access to the father. Furthermore, he imposed an injunction upon either party restraining them from removing the two boys from the jurisdiction of the court in Ontario. That order and the date thereof is of importance in this case. In March 1986 the father was due to have the boys with him for the purpose of access for a week's holiday. If he had complied with the order, the father would have returned the two children to the mother on 15 March 1986, which is the second important date

in this history. He failed to do so. He alleged, and continues to allege, that the children complained of attempts by the mother to convert them to Christianity. He alleged that they no longer wished to live with the mother. He expressed grave concerns about their upbringing and, above all, he stated that he felt that the Supreme Court (I do not use his words) really let him down by not ensuring that the children were brought up according to the tenets of the Sikh philosophy or religion. So, under what he described as tremendous pressure and in the belief that the court were unable to protect his children, he violated the order of the Supreme Court on that date. The mother contacted the police and lodged complaints. Since, prima facie, the father was guilty of the criminal offence of abduction, warrants were issued for the father's arrest. According to the father, he took the children to England and then to India to what he describes as his 'ancestral home' in the Punjab. There the children were enrolled at a public school. In the autumn of 1986, again according to the father, he applied for a divorce.

"At the end of 1986 he applied for the custody of the children to the Indian court. The mother acknowledged receipt of the application through her solicitors and forwarded a copy of the Ontario court's judgment to the Indian court, requesting the return of her children. The mother's case is that she was not subsequently informed of the actual date of the custody hearing in India. The father was granted a divorce in due course and remarried and now has two children by that second marriage. In July 1987 the mother received information that the father and the two boys were still in India, and she learned of the remarriage. She swore an affidavit to support the request for the father's extradition from India. On 23 July 1987 Judge Bollan, sitting in the Supreme Court in Ontario, gave leave for the mother to obtain passports for the children for the purpose of giving effect to her custodial rights. He also issued an order which might result in the apprehension of the children: what would here be called a seek and find order. On 27 July 1987 the Indian court sat in judgment and, exercising the equivalent of wardship jurisdiction there, awarded custody of the two children to the fa-

ther. It would appear that the Indian court was aware of the Canadian judgment but nonetheless proceeded to make the order I have just referred to. Towards the end of July the mother went to India, where she learned that the father had applied for immigration papers with a view to returning with his new wife to England along with the two boys. The father states that the mother, during her stay in India, went to T.'s school there and tried to entice him away. No doubt there is a dispute about that. He also says that the mother and he met together, and again this is disputed. In January 1988 the mother remarried and went to live with her new husband in Indianapolis. The father states that towards the end of 1988 he and the two children returned to England and lived with his mother and two brothers at an address in Barking, Essex. There is some quite involved dispute about the facts here not material to this application. The father obtained employment in this country. In June 1989 the

mother, who appears to have lost touch with the children, located them through her sister at the address in Barking. She then contacted the authorities in Canada and sought legal advice. Up to this stage the Hague Convention played no part in her thinking or the thinking of her advisers. They were focusing upon the proceedings for the father's extradition. The mother said that she was unaware of the Convention and not advised about it.

"The elder boy, T., in late 1989 sat his entrance examination for a college in Essex and the children started at new schools. In June 1990 the extradition proceedings were started in England. At this stage the Convention beings to play a part. On 22 June 1990 the wife, who must by now have been advised as to her rights under the Convention, issued this application under the Act of 1985. Douglas Brown J. directed the father to hand over the children to the tipstaff. He awarded the interim care and control of the two boys to the mother, and ordered that they were not to be removed from her without leave of the court or further order. On 26 June the children were located and passed into the physical care and control of the mother. On 4 July Johnson J. heard the application of the father for interim care and control to be passed back to him. Johnson J. refused that application. At the same time he ordered that the court welfare officer should interview the children on the question of their attitude towards returning to Canada. It transpires that, during the course of a 20-minute interview, the court welfare officer has elicited that both boys wish to go to Canada; that this is known to the father, and indeed has been referred to explicitly in these proceedings. The battle is now joined, in the sense that affidavits have been sworn. The father has enlisted the support of his family and of neighbours, who all testify that they have seen the two boys living a normal and cheerful life. Dr. Arnold Bentovim, the well known child psychiatrist, has also produced his evidence, which is solely opinion evidence - he has not seen the children and indeed is wholly unaware of their wishes. But he has stated in paragraph 4 of his affidavit: 'Although it is extremely regrettable that these children were removed from their mother's care four years ago, it seems clear from the school reports that these children have settled with their father and are making good progress, which would indicate a degree of emotional adaption to the situation with their father. It may be deleterious to their progress for any abrupt change to take place in their lives at this time from their father's care, particularly if there is a question of them living in another country. They may suffer extreme psychological trauma.' I would describe that affidavit as guarded in its terms and, with great respect to Dr. Bentovim, one on which it would not be wise to place too great a reliance, having regard to the fact that he has not been able to investigate this matter in any depth."

The Act was passed in order to enable the United Kingdom to ratify inter alia the 1980 Hague Convention on the Civil Aspects of International Child Abduction. For the purpose of the Act, the

contracting states other than the United Kingdom are those specified by Order in Council under section 2. Canada has been such a state from August 1986 in relation to all the provinces, other than Saskatchewan and Alberta, which were added with effect from 1 November 1986 and 1 February 1987 respectively. Section 2 also provides expressly:

"except where the Order otherwise provides, the Convention shall apply as between the United Kingdom and that state only in relation to wrongful removals or retentions occurring on or after that date."

The relevant Order in Council, now the Child Abduction and Custody (Parties to Conventions) (Amendment) (No. 2) Order 1987 (S.I. 1987 No. 1825) makes no such special provision.

Apart from the objections arising out of the fact that the children left Canada before the Act came into force, there is no longer any dispute about its application. Articles 3 and 5(a) of the Convention are in the following terms:

"Article 3

"The removal or the retention of a child is to be considered wrongful where - (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the state in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or re-

tention. The rights of custody mentioned in sub-paragraph (a) above may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that state. . . .

"Article 5

"For the purposes of this Convention - (a) 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;"

At the time in March 1986 when the children left Canada, both the mother and the Supreme Court of Ontario had rights of custody within the meaning of the Convention - the mother in relation to custody, care and control, and the court in relation to removal from its jurisdiction - and taking the children abroad without the consent of either the mother or the court involved breaches of those rights.

It was argued below that the Convention did not apply because by 1 August 1986 it could no longer be said that Canada or Ontario, under whose law the rights of custody arose, was "the state in which the child was habitually resident immediately before the removal or retention," since by then they had for some months been living in India. This was rightly rejected by the judge on the ground that a wrongful act by the father could not alter the habitual residence of the children for the

purposes of the Act and the Convention. It would have been otherwise if the father's act had been lawful: see In re J. (A Minor) (Abduction: Custody Rights) [1990] 2 A.C. 562. This is now accepted.

The sole reason why Anthony Lincoln J. held the Act to be inapplicable was that "wrongful retention" like "wrongful removal" was treated as an event which occurred on a specific occasion and was not a continuing state. This is shown most clearly by a consideration of article 12, which contains a reference to "a period of less than one year has elapsed from the date of the wrongful removal or retention" in which event, subject to article 13, the court is required to order the return of the child forthwith, whereas if a year or more has elapsed the court has to consider whether it is demonstrated that the child is now settled in its new environment. This assumes a fixed terminus a quo in the case of retention as well as removal, and is inconsistent with retention being treated as a continuing breach of rights of custody. The judge held that "the initial retention occurred in March 1986," which was before the Act came into force.

In this court Mr. Wall, appearing for the mother, virtually accepted that "wrongful retention" was not a continuing state for the purposes of the Act and the Convention, but he argued that neither took cognizance of a wrongful retention before 1 August 1986, and that accordingly, for those purposes, the wrongful retention took place on that date when for the first time the Act and Convention took cognizance of it.

I cannot accept this argument. Section 2(2) of the Act, which reads: "and, except where the Order otherwise provides, the Convention shall apply as between the United Kingdom and that state only in relation to wrongful removals or retentions occurring on or after that date," clearly contemplates that for Convention purposes wrongful removals and retentions can occur and be recognised as such before the date when the Act and Convention came into force.

This would have been sufficient to dispose of this appeal if, contrary to the fact, the Ontario court had agreed to the father taking the children out of its jurisdiction and he had failed to return them to that jurisdiction at the end of the holiday. However, on the facts as they are, the appeal should in my judgment be dismissed upon a different ground, namely, that for the purposes of the Act and Convention there was a wrongful removal in March 1986 and there never was any wrongful retention.

The Convention throughout treats removal and retention as true alternatives. In In re J. (A Minor) (Abduction: Custody Rights) [1990] 2 A.C. 562, 571, I said:

"For my part, I entirely agree with [Douglas Brown J.] that retention after a period of lawful possession - by which I think he was quite plainly addressing his mind to a limited period of possession such as commonly occurs when access rights are exercised or where both parents agree to a child going abroad, perhaps to visit grandparents or something of that sort, but the intention being merely that it should be a temporary visit - is the situation at which this provision is primarily addressed. However, I am bound to say

that, if the wording of the Convention has a wider effect and sweeps up other situations, then, as I see it, it would be our duty to give effect to it."

[1991] 2 AC 476

In this appeal I have had to give this aspect further thought. I still think that the contrast is between an act of removal which at once breaches rights of custody and an act which only does so when it is continued beyond the limits of lawfulness in terms of time. However in the context of this case I have also asked myself: "removal from what?" and the answer must, I think, be "removal from the jurisdiction of the courts of the child's habitual residence. If this is right, "retention" must similarly have an extraterritorial component, namely "retention outside the jurisdiction." The contrast is between the case of an English ward of court who is taken abroad without the consent of the court, which is a wrongful removal, and one who leaves the jurisdiction with the court's consent for a limited stay abroad and is not returned, which is a wrongful retention. The two cases are mutually exclusive and, as applied to the facts of this case, the children were the victims of a wrongful removal and not of a wrongful retention.

There are at least two pointers to this being the correct approach. The first is contained in article 12 and, in particular, the contrast between the first and second paragraphs. If the terminus a quo for the one year period is the moment when the child leaves "the state in which [it] was habitually resident immediately before the removal or retention" (see article 3), it makes sense that after the expiration of this one year period the court should inquire whether the child has settled into its new environment. If, however, the terminus a quo has no reference to a change in territoriality, the second paragraph of article 12 would apply in a situation in which a child has been wrongfully retained in its home state for over 12 months and then removed to another state, where it was soon discovered. In such a case no question of settlement in a new environment would arise, yet the Convention assumes that it would.

The second is the wording of article 3: "in breach of rights of custody . . . under the law of the state in which the child was habitually resident immediately before the removal or retention . . ." (My emphasis.) Although quite plainly the Act and Convention can only apply if the child is found in a different state from that in which it was habitually resident, this wording suggests that it is the removal out of the original jurisdiction or the retention out of that jurisdiction which of itself gives rise to a conflict of laws.

Anthony Lincoln J. went on to consider various matters which would have arisen for consideration under the Convention if he had been wrong in his primary holding that it had no application. In my judgment he was right to hold that the Convention did not apply and his conclusion on these other matters, whilst entitled to great respect, should not be taken to bind the judge who is charged with the wardship jurisdiction in relation to these children who, if so minded, will be free to hear further evidence and to reach a different conclusion.

It was agreed at the conclusion of the argument that so far as the costs of the appeal were concerned, there should be no order other than one for legal aid taxation.

**JUDGMENTBY-2:** STUART-SMITH L.J

**JUDGMENT-2:**

STUART-SMITH L.J: I agree that this appeal should be dismissed. In the judgment of Anthony Lincoln J., and in the arguments of counsel, it seems to have been assumed that the relevant removal or retention referred to in article 3 of the Convention was removal from the custody or care of the parent or other person who was exercising those rights. For my part I am not persuaded that this assumption was wrong, and on this point I respectfully differ from Lord Donaldson of Lymington M.R. and Sir Roger Ormrod who take the view that the removal or retention must be a removal from the jurisdiction of the court or retention outside its jurisdiction.

I acknowledge that such a construction perhaps makes better sense of the provision in article 12 that even after the expiry of a year from the removal or retention, the judicial or administrative authority shall order the return of the child, unless it is demonstrated that the child is now settled in its new environment. But it does not seem to me to be necessary to imply these additonal words into article 3. The Convention does not apply at all unless the child is taken from the territory of one party to the Convention to that of another. It is perhaps worthy of note that in the European Convention on Recognition and Enforcement of Decisions concerning Custody of Children, and on the Restoration of Custody of Children certain provisions of which have the force of law in the United Kingdom by virtue of section 12(2) of the Child Abduction and Custody Act 1985, "improper removal" is defined as removal of a child across an international frontier in breach of a decision relating to his custody: see article 1(d). I do not suggest that one can construe an international Convention by reference to a European Convention, even on a related topic; but merely that if removal were intended to mean removal from the jurisdiction of the court rather than the custody of the parent, it seems to me that one would expect article 3 to say so in terms. I do not therefore think that this was a case of wrongful removal when the children were taken from Ontario.

Both before this court and Anthony Lincoln J., counsel on behalf of the mother submitted that the word "retention" involved a continuing state of affairs, going on from day to day until the child was returned to the parent who was entitled to its custody. While the word "retention" frequently does have this meaning it may, as it seems to me, involve only a single act or event, if the context so requires.

Section 2(2) of the Act of 1985 provides:

"An Order in Council under this section shall specify the date of the coming into force of the Convention as between the United Kingdom and any state specified in the Order; and, except where the Order otherwise provides, the Convention shall apply as between the United Kingdom and that state only in relation to wrongful removals or retentions occurring on or after that date."

The use of the word "occurring" is appropriate to a single event, but not to a continuous state of affairs.

It was common ground between counsel that the word "retention" was apt to cover a situation where the child has been lawfully in the care of one parent, for example, during a period of access, but that

parent fails to return the child at the end of the period of access. But Mr. Wall submits that every wrongful removal is followed by a wrongful retention, until the child is returned. If that is so, then it would seem that the word "removal" itself would be unnecessary. Article 3 itself therefore seems to me to predicate that removal and retention are mutually exclusive concepts.

But the most compelling argument against Mr. Wall's construction appears to me to be based on article 12. This provides:

"Where a child has been wrongfully removed or retained in terms of article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the contracting state where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith."

In my judgment this postulates a single event, both in the case of removal and retention from which the period of one year can begin to run. It cannot be a continuing event. Moreover, I cannot accept that the wrongful retention only starts on 1 August 1986 when the Convention was applied as between the United Kingdom and Ontario, since section 2(2) plainly postulates wrongful retentions occurring before this date.

Accordingly I agree with the reasoning of the judge that this was a wrongful retention which occurred when the children were not returned at the end of the period of access, and that event was plainly before 1 August 1986.

**JUDGMENTBY-3:** SIR ROGER ORMROD

**JUDGMENT-3:**

SIR ROGER ORMROD: The issue in this appeal is whether the Child Abduction and Custody Act 1985 applies or not to this case. Anthony Lincoln J. held that it did not, by reason of section 2 which provides that the Convention shall only apply "in relation to wrongful removals or retentions occurring on or after that date . . ." i.e. 1 August 1986, the date on which the relevant Order in Council came into effect.

On the facts, the mother obtained an order for custody of both children in the Court of Ontario on 20 September 1985. In March 1986 the father had access to the children under the order. He ought to have returned the children to the mother on 15 March 1986. Instead, he removed the children out of Ontario to India. All this occurred before 1 August 1986; therefore, unless "retention" can be regarded as a continuing state of affairs, section 2 applies to exclude this case from the Act.

Mr. Wall virtually concedes that in this context "retention" is not a continuing state of affairs - rightly in my opinion. Nevertheless, he sought to argue that in such a situation as this "retention" must be deemed to occur on the date on which the Act became applicable. This cannot be right in my view because it would mean that the exclusion in section 2 would be bypassed in every case.

Although it makes no difference to the result, given the dates set out above, it is questionable whether the judge was right to treat this as a case of retention rather than removal. The question arises as to what the

words "removal" and "retention" in section 2 mean. Do they relate to the mother's custodial rights, or to the jurisdiction of the court of the habitual residence of the children?

At first sight article 3 appears to define removal or retention in terms of breach of rights of custody but, in fact, its purpose is to define "wrongful."

The Act and the Convention are only concerned with children who are no longer within the jurisdiction of the original court: there are only two ways in which this can come about wrongfully - by removal of the child from the jurisdiction without consent, or by removing the child with consent, but failing to return the child in accordance with the order or agreement: that is, wrongfully retaining the child.

On this footing the father had no right to remove the children from Ontario, although he could remove them from the mother's care for the period of access. It follows that this is actually a case of wrongful removal.

I would, however, dismiss this appeal.

**JUDGMENTBY-4:** LORD BRIDGE OF HARWICH

**JUDGMENT-4:**

LORD BRIDGE OF HARWICH: My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Brandon of Oakbrook.  I agree with it and for the reasons he gives I would dismiss these appeals.

**JUDGMENTBY-5:** LORD BRANDON OF OAKBROOK

**JUDGMENT-5:**

LORD BRANDON OF OAKBROOK: My Lords, the House has before it two appeals relating to claims by the mothers of children abducted by their fathers from their habitual places of residence in countries abroad and taken to the United Kingdom.  In each case the claim was brought under the Child Abduction and Custody Act 1985, by which domestic effect was given to the adherence of the United Kingdom to the Convention on the Civil Aspects of International Child Abduction signed at The Hague on 25 October 1980 (Cmnd. 8281).  It will be convenient to refer to the cases in which the two appeals arise as In re H. and In re S. respectively.

The appeal in In re H. is from an order of the Court of Appeal (Lord Donaldson of Lymington M.R., Stuart-Smith L.J. and Sir Roger

Ormrod) [1991] 2 W.L.R. 62.  By that order the Court of Appeal dismissed an appeal by Mrs. H. from an order of Anthony Lincoln J. dated 11 July 1990 dismissing her application for the summary return of her two children, T. and J., to the jurisdiction of the Supreme Court of Ontario.  The appeal in In re S. is a leapfrog appeal from an order of Booth J. dated 28 August 1990 by which she dismissed the application of Mrs. S. for the summary return of her two children, B. and A., to the jurisdiction of the Superior Court of California, County of Santa Clara.  Both appeals are brought by the leave of the House.

The ground on which the Court of Appeal rejected the claim of Mrs. H. in In re H. was that, having regard to the relative dates of the acts of Mr. H. relied on and of the coming into force of the Convention between the United Kingdom and Ontario, the Convention did not apply and the court therefore had no jurisdiction to make any order under it. In In re S. Booth J. rightly held that the essential facts in that case could not be distinguished from those in In re H., that she was bound by the decision of the Court of Appeal in that case, and she therefore had no alternative but to dismiss Mrs. S.'s claim.  In these circumstances it is common ground that the two appeals succeed or fail together.

The material facts and the history of the proceedings in or related to In re H. are as follows.  Both the appellant, Mrs. H., and the respondent, Mr. H., were born in India.  In 1974 they were married in England.  In 1976 they emigrated to Canada where they had two children, T. now aged 12 and J. now aged 11.  Those children and Mrs. H. are Canadian citizens.  The marriage was unhappy and in January 1984 Mrs. H. left Mr. H. taking the two children with her.  On 20 September 1985 the Supreme Court of Ontario made an order granting the custody of both children to Mrs. H., with access to Mr. H., and restraining both parents from removing the children from the jurisdiction of that court. In early March 1986 Mr. H. took the children lawfully to a place in Ontario for a week's staying access.  The children should have been returned by him to Mrs. H. on 15 March 1986, but soon after the commencement of the period of

access Mr. H. took the children from Ontario first to England and subsequently to India. In doing so he acted in direct breach of the order of the Supreme Court of Ontario referred to above and therefore unlawfully. The children remained with Mr. H. in India until about the end of 1988 or beginning of 1989 when he took them again to England. His marriage to Mrs. H. had by then been dissolved. Mrs. H. subsequently discovered that the children were in England and took steps under the Convention to have them returned to Ontario. She applied to the Central Authority for Canada designated for the purposes of the Convention, which then made a request to the Lord Chancellor, as the Central Authority similarly designated for England and Wales, for an order that the children be returned to the jurisdiction of the Supreme Court of Ontario pursuant to the Convention. On 22 June 1990 the Lord Chancellor, on behalf of Mrs. H. and in her name, applied to the Family Division of the High Court here for such an order under the Act of 1985. As indicated earlier, that application was dismissed by Anthony Lincoln J. on 11 July 1990 and Mrs. H.'s appeal from his decision to the Court of Appeal was dismissed on 27 July 1990.

Meanwhile on 11 July 1990 parallel proceedings in wardship were begun by Mr. H., as a result of which the children were made wards of court and the interim care and control of them in England was given to Mrs. H. On 20 August 1990 the full hearing of the wardship proceedings came before Rattee J., who on 23 August 1990 made an order the main effect of which was to give Mrs. H. care and control of the children and leave to take them out of the jurisdiction to a new home which she had established with her second husband in Indianapolis, in the State of Indiana, subject to the children remaining wards of court and to Mrs. H. undertaking to return them to the jurisdiction if called upon to do so. Pursuant to that order the children are presently living with Mrs. H. and her second husband in Indianapolis.

The material facts and the history of the proceedings in or related to In re S. are as follows. The appellant, Mrs. S., and the respondent, Mr. S., are the parents of two children, B. now aged 11 and A. now aged eight. Mr. and Mrs. S. and the children were all born in the United States of America and are citizens of that country. The marriage of Mr. and Mrs. S. was unhappy and at some time prior to August 1986 they separated and subsequently the marriage was dissolved. Following the separation proceedings relating to the children were begun in the Superior Court of California, County of Santa Clara, and by an order of that court dated 8 September 1986 it was provided that after 1 September 1986 Mrs. S. should have the physical care of the children during the week in school term time and that Mr. S. should have weekend staying access to them. The order further provided that Mr. S. should have staying access in the school summer holiday with the express stipulation that the children should not be away from either parent in that period without prior written consent. On 26 June 1987 Mr. S. took the children for a week's staying access in California pursuant to the order. They were due to be returned to Mrs. S. on 5 July 1987 but Mr. S. did not return them and instead took them out of California and in July 1987 to England without Mrs. S.'s knowledge or consent. In so doing he acted in direct breach of the order referred to above and therefore unlawfully. On 10 August 1990 Mrs. S. discovered that the children were in England and took steps under the Convention to have them returned to the United States of America. She applied to the Central Authority for the United States of America designated for the purposes of the Convention, which then made a request to the Lord Chancellor, as the Central Authority similarly designated for England and Wales, for an order that the children be returned to the State of California. On 21 August 1990 the Lord Chancellor, on behalf of Mrs. S. and in her name, applied to the Family Division of the High Court here for such an order under the Act of 1985. As indicated earlier, that application was dismissed by Booth J. on 28 August 1990.

On that date parallel proceedings in wardship were begun by Mrs. S., as a result of which the children were made wards of court and the interim care and control of the children was given to Mr. S. with access to Mrs. S. In October 1990 the full hearing of the wardship proceedings came for hearing by Ward J., who on 19 October 1990 made an order the main effect of which was to give Mrs. S. as from 30 October 1990

the care and control of the children and leave to take them out of the jurisdiction to her home in the United States of America, subject to the children remaining wards of court and to Mrs. S. undertaking to return them to the jurisdiction if called upon to do so. Pursuant to that order the children are presently living with Mrs. S. in the United States of America.

It will be apparent that, as a result of the wardship proceedings in each case, Mrs. H. and Mrs. S. have achieved their main object of securing the return of their children to their care in the country in which they have chosen to make their home. That being so, the view might be taken that the present appeals, even if successful, would not serve any further useful purpose for them. To take that view, however, would be to ignore the important fact that, under the orders made in the two wardship proceedings, the children in each case remain wards of the High Court in England, and that both Mrs. H. and Mrs. S. are bound by undertakings to return their children to the jurisdiction of that court if called upon to do so. Success in the appeals, if obtained, would mean that the applications made on behalf of and in the names of Mrs. H. and Mrs. S. for summary orders for the return of their children under the Act of 1985 should have

been allowed and that they were therefore entitled to have the custody of their children untrammelled by the orders made in the wardship proceedings, which would then have to be discharged. It is in this respect that the present appeals, if successful, would put Mrs. H. and Mrs. S. in a better position with regard to their children than they are in at present.

The Convention, which was signed by the United Kingdom on 19 November 1984 and ratified by it on 20 May 1986, provides, so far as material:

"The states signatory to the present Convention,

"Firmly convinced that the interests of children are of paramount importance in matters relating to their custody,

"Desiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the state of their habitual residence, as well as to secure protection for rights of access,

"Have resolved to conclude a Convention to this effect, and have agreed upon the following provisions -

"Chapter I.   Scope of the Convention

"Article 1

"The objects of the present Convention are - (a) to secure the prompt return of children wrongfully removed to or retained in any contracting state; and (b) to ensure that rights of custody and of access under the law of one contracting state are effectively respected in the other contracting states."

"Article 3

"The removal or the retention of a child is to be considered wrongful where - (a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone,

under the law of the state in which the child was habitually resident immediately before the removal or retention; and (b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

"The rights of custody mentioned in sub-paragraph (a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that state.

"Article 4

"The Convention shall apply to any child who was habitually resident in a contracting state immediately before any breach of custody or access rights.   The Convention shall cease to apply when the child attains the age of 16 years.

"Article 5

"For the purposes of this Convention - (a) 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence; (b) 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

"Chapter II.   Central authorities

"Article 6

"A contracting state shall designate a central authority to discharge the duties which are imposed by the Convention upon such authorities. . .

"Article 7

"Central authorities shall co-operate with each other and promote co-operation amongst the competent authorities in their respective states to secure the prompt return of children and to achieve the other objects of this Convention . . .

"Chapter III.   Return of children

"Article 8

[1991] 2 AC 476

"Any person, institution or other body claiming that a child has been removed or retained in breach of custody rights may apply either to the central authority of the child's habitual residence or to the central authority of any other contracting state for assistance in securing the return of the child. . . ."

"Article 12

"Where a child has been wrongfully removed or retained in terms of article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the contracting state where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

"The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment. . . .

"Article 13

"Notwithstanding the provisions of the preceding article, the judicial or administrative authority of the requested state is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that - (a) the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention, or had consented to or subsequently acquiesced in the removal or retention; or (b) there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation. The judicial or administrative authority may also refuse to order the return of the child if it finds that the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take accounts of its views. . . ."

"Chapter V. General provisions

"Article 35

"This Convention shall apply as between contracting states only to wrongful removals or retentions occurring after its entry into force in those states."

The Convention entered into force in the United Kingdom on 1 August 1986 upon the coming into force of the Act of 1985 pursuant to the Child Abduction and Custody Act 1985 (Commencement) Order 1986 (S.I. 1986 No. 1048). The Act of 1985 provides, so far as material:

"Part I

"International child abduction

"1(1) In this Part of this Act 'the Convention' means the Convention on the Civil Aspects of International Child Abduction which was signed at The Hague on 25 October 1980. (2) Subject to the provisions of this Part of this Act, the provisions of that Convention set out in Schedule 1 to this Act shall have the force of law in the United Kingdom.

"2(1) For the purposes of the Convention as it has effect under this Part of this Act the contracting states other than the United Kingdom shall be those for the time being specified by an Order in Council under this section. (2) An Order in Council under this section shall specify the date of the coming into force of the Convention as between the United Kingdom and any state specified in the Order; and, except where the Order otherwise provides, the Convention shall apply as between the United Kingdom and that state only in relation to wrongful removals or retentions occurring on or after that date."

Schedule 1 to the Act of 1985 sets out (inter alia) articles 3, 4, 5, 7, 8, 12 and 13 of the Convention. It does not set out the preamble, article 1 or article 35.

The relevant Orders in Council for the purposes of section 2 of the Act of 1985 are the Child Abduction and Custody (Parties to Conventions) Order 1986 (S.I. 1986 No. 1159), as amended, and the Child Abduction and Custody (Parties to Conventions) (Amendment) (No. 2) Order 1988 (S.I. 1988 No. 1083). Under the first of these Orders the Convention came into force as between the United Kingdom and Ontario on 1 August 1986. Under the second Order the Convention came into force between the United Kingdom and the United States of America on 1 July 1988. Neither Order "otherwise provides" for the purposes of section 2(2).

The same question arises for decision in both In re H. and In re S. It is what is the meaning in the Convention of the expression removal, with its cognate verb removed, on the one hand, and the expression retention, with its cognate verb retained, on the other. The question comprises three points which need to be considered separately. The first point is whether removal and retention are both events which occur once and for all on a specific occasion, or whether, while removal is such an event, retention is a state of affairs beginning on a specific occasion but continuing from day to day thereafter. The second point is whether removal and retention are mutually exclusive concepts, so that in any particular situation a child may either be removed or retained but not both, or whether removal can, and ordinarily will, be followed by continuing retention. The third point is whether removal or retention means removal from or retention out of the care of the parent having the custodial rights, or removal from or retention out of the jurisdiction of the courts of the child's habitual place of residence.

The Court of Appeal in In re H. dealt with these three points as follows. With regard to the first point, it held that removal and retention are both events which occur once and for all on a specific occasion. With regard to the second point, it held that removal and retention were mutually exclusive concepts. With regard to the third point, it held by a majority (Stuart-Smith L.J. dissenting) that removal or retention meant removal from or retention out of the jurisdiction of the courts of the child's habitual place of residence, so that In re H. was one of removal and not one of retention. It was not in dispute that Mr. H. had taken his two children out of Ontario a few days before 15 March 1986, that is to say on a date well before the date of 1 August 1986 on which the Convention came into force as between the United Kingdom and Ontario. It follows, on the Court of Appeal's views on the meaning in the Convention of the expressions removal and retention, that the Convention did not, by reason of section 2(2) of the Act of 1985, apply to In re H. and that the court therefore had no jurisdiction to make the order sought by Mrs. H.

Mr. Munby, as counsel for both the appellants, Mrs. H. and Mrs. S., challenged the views of the Court of Appeal on each of the three points referred to above. With regard to the first point, he submitted that, while removal was an event which occurred once and for all on a

specific occasion, retention was a continuing state of affairs, beginning on a specific occasion but continuing from day to day thereafter. With regard to the second point, he submitted that, while retention could occur without prior removal, where there was removal it would in practice always be followed by retention. The two expressions could not, therefore, be treated as mutually exclusive. With regard to the third point, he submitted that removal or retention meant removal from, or retention out of, the care of the parent with custodial rights. On the basis of these submissions, Mr. Munby contended that the case of In re H. was a case of retention rather than one of removal; that the retention continued from day to day after its inception; and that it was, therefore, still in existence at all material times from 1 August 1986, the date on which the Convention came into force as between the United Kingdom and Ontario.

In support of his contention that retention in the Convention meant a continuing state of affairs which could follow on after removal, Mr. Munby relied on two main matters. First, the ordinary and natural meaning of the word retention and, secondly, various observations made by judges in a number of reported cases, including in particular observations contained in my speech in In re J. (A Minor) (Abduction: Custody Rights) [1990] 2 A.C. 562, 578-579. With regard to the first matter, I would agree that retention can and usually does connote a continuing state of affairs. The word may, however, be used in a context in which it means, and can only mean, an event occurring once and for all on a specific occasion. Imprisonment is another word which is capable of having two similarly different meanings. With regard to the second matter, in none of the reported cases, including In re J., in which the observations relied on by Mr. Munby were made, was it necessary to decide between the two possible meanings of retention. It follows that all such observations were no more than obiter dicta. In these appeals, however, it is necessary to decide between the two meanings and for that purpose to have regard to the context of the Convention as a whole.

Before addressing the three points in respect of which Mr. Munby challenges the view taken by the Court of Appeal, I would make some preliminary observations about the nature and purpose of the Convention. The preamble of the Convention shows that it is aimed at the protection of children internationally(my emphasis) from wrongful removal or retention. Article 1(a) shows that the first object of the Convention is to secure the prompt return to the state of their habitual residence (that state being a contracting state) of children in two categories: (1) children who have been wrongfully removed from the state of their habitual residence to another contracting state; and (2) children who have been wrongfully retained in a contracting state other than the state of their habitual residence instead of being returned to the latter state. The Convention is not concerned with children who have been wrongfully removed or retained within the borders of the state of their habitual residence.

[1991] 2 AC 476

So far as category (1) is concerned, it appears to me that a child only comes within it if it is wrongfully taken out, i.e. across the frontier, of

the state of its habitual residence. Until that happens, although the child may already have been wrongfully removed within the borders of the state of its habitual residence, it will not have been wrongfully removed for the purposes of the Convention. So far as category (2) is concerned, it appears to me that a child can only come within it if it has first been removed rightfully (e.g. under a court order or an agreement between its two parents) out of the state of its habitual residence and subsequently retained wrongfully (e.g. contrary to a court order or an agreement between its two parents) instead of being returned to the state of its habitual residence. The wrongful retention of a child in one place in the state of its habitual residence, instead of its being returned to another place within the same state, would not be a wrongful retention for the purposes of the Convention. The typical (but not necessarily the only) case of a child within category (2) is that of a child who is rightfully taken out of the state of its habitual residence to another contracting state for a specified period of staying access with its non-custodial parent, and wrongfully not returned to the state of its habitual residence at the expiry of that period.

In the light of these preliminary observations I turn to the three points in respect of each of which the view taken by the Court of Appeal has been challenged by Mr. Munby. With regard to the first point, whether retention is an event occurring on a specific occasion or a continuing state of affairs, it appears to me that article 12 of the Convention is decisive. I set out that article earlier but it will be helpful to set it out again now. It provides:

"Where a child has been wrongfully removed or retained in terms of article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the contracting state where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.

"The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment. . . ."

The period of one year referred to in this article is a period measured from the date of the wrongful removal or retention. That appears to me to show clearly that, for the purposes of the Convention, both removal and retention are events occurring on a specific occasion, for otherwise it would be impossible to measure a period of one year from their occurrence. It was submitted by Mr. Munby that, in the case of retention, the date from which the period of one year was to be measured was the date of the inception of the retention and that, if article 12 was interpreted in that way, it was not inconsistent with retention being a continuing state of affairs. I find myself unable to accept that submission. To interpret article 12 in that way involves inserting into it words which are not there and, if intended to apply,

could readily have been put in. I consider that article 12 leads inevitably to the conclusion that retention, like removal, is an event occurring on a specific occasion.

With regard to the second point, whether removal and retention are mutually exclusive concepts it appears to me that, once it is accepted that retention is not a continuing state of affairs but an event occurring on a specific occasion, it necessarily follows that removal and retention are mutually exclusive concepts. For the purposes of the Convention, removal occurs when a child, which has previously been in the state of its habitual residence, is taken away across the frontier of that state; whereas retention occurs where a child, which has previously been for a limited period of time outside the state of its habitual residence, is not returned to that state on the expiry of such limited period. That being so, it seems to me that removal and retention are basically different concepts, so that it is impossible either for them to overlap each other or for either to follow upon the other. This interpretation of the Convention is strongly supported by the fact that, throughout the Convention, removal and retention are linked by the word "or" rather than by the word "and," which indicates that each is intended to be a real alternative to the other. It was submitted by Mr. Munby that the word "or," where it links removal and retention, should be construed as meaning "and/or." This again involves inserting into the Convention words which are not there, and which could, if intended to apply, readily have been put in. I cannot, therefore, accept that submission.

With regard to the third point, whether removal or retention means removal from or retention out of the care of the parent having the custodial rights, or removal from or retention out of the jurisdiction of the courts of the state of a child's habitual residence, I am of opinion that the latter meaning is the correct one. I think that follows necessarily from the considerations to which I referred in my preliminary observations about the nature and purpose of the Convention, that the Convention is only concerned with international protection for children from removal or retention, and not

with removal or retention within the state of their habitual residence. It was suggested in argument that article 3(b) was difficult to reconcile with the view on the third point which I have said that I regard as correct.   Article 3(b) specifies the second of two matters required to render a removal or retention wrongful.   That second requirement is that at the time of removal or retention the custody rights of the custodial parent "were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." It was suggested that, if removal for the purposes of the Convention involved the taking of the child concerned across the frontier of the state of its habitual residence, it might be impossible for the custodial parent to show that the requirement contained in article 3(b) was satisfied.   In my view article 3(b) must be construed widely as meaning that the custodial parent must be maintaining the stance and attitude of such a parent, rather than narrowly as meaning that he or she must be continuing to exercise day to day care and control.   If the narrow meaning was adopted, it could be said that a custodial parent was not actually exercising his or her

custodial rights during a period of lawful staying access with the non-custodial parent. That, as it seems to me, cannot be right.   Provided that what I have described as the broader meaning of the requirement contained in article 3(b) is adopted, I do not consider that such requirement is inconsistent with the view on the third point which I have said that I regard as correct.

I would add that the views which I have expressed on the first and second points are in accordance with the decision of the Lord Ordinary (Lord Prosser) in the Scottish case, Kilgour v. Kilgour, 1987 S.L.T. 568.

In the result I have reached the same conclusions on each of the three points in issue as the Court of Appeal reached, either unanimously or by a majority, in In re H.   I also agree with the Court of Appeal that, on the basis of those conclusions, In re H. was a case in which the children were the subject of removal rather than retention.   Since it is common ground that the essential facts in In re S. cannot be distinguished from those in In re H., it follows that the children in In re S. were also the subject of removal rather than retention.   It further follows that in In re H. the wrongful removal took place before the Convention had come into force as between the United Kingdom and Ontario, and that in In re S. the wrongful removal took place before the Convention had come into force as between the United Kingdom and the United States of America, so that, by reason of section 2(2) of the Act of 1985, the court had no jurisdiction in either case to make an order for the summary return of the children under the Act.

My Lords, for the reasons which I have given I would dismiss both the appeals.

**JUDGMENTBY-6:** LORD GRIFFITHS

**JUDGMENT-6:**

LORD GRIFFITHS: My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Brandon of Oakbrook. I agree with it and, for the reasons which he gives, I too, would dismiss both the appeals.

**JUDGMENTBY-7:** LORD OLIVER OF AYLMERTON

**JUDGMENT-7:**

LORD OLIVER OF AYLMERTON: My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Brandon of Oakbrook. I agree with it and, for the reasons which he gives, I too, would dismiss both the appeals.

**JUDGMENTBY-8:** LORD JAUNCY OF TULLICHETTLE

LORD JAUNCY OF TULLICHETTLE: My Lords, I have had the advantage of reading in draft the speech of my noble and learned friend, Lord Brandon of Oakbrook. I agree with it and, for the reasons which he gives, I too, would dismiss both the appeals.

D. E. C. P.

C. T. B.

(C)2001 The Incorporated Council of Law Reporting for England & Wales

[1991] 2 AC 476

**DISPOSITION:**

Appeal dismissed.

Legal aid taxation.

Leave to appeal refused.

Appeals dismissed.

**SOLICITORS:**

Solicitors: Ralph Haring & Co.; E. Edwards Son & Noice, Grays.

Solicitors: Ralph Haring & Co.; E. Edwards Son & Noice, Grays.

Copyright © 2001 The Incorporated Council of Law Reporting for England & Wales